**In the Matter of KAHL IRON FOUNDRY, INC., Debtor.**

**Bankruptcy No. 79–92837–W.**

United States Bankruptcy Court,
E. D. Michigan, S. D.

July 1, 1982.

Steven G. Howell, Birmingham, Mich., for receiver/trustee.

Norman D. Orr, Southfield, Mich., for King Scrap Iron and Metal Co.

MEMORANDUM OPINION AND ORDER

GEORGE E. WOODS, Bankruptcy Judge.

This matter comes before the Court upon the application of King Scrap Iron and Metal Company, Inc., for the turnover of proceeds, objections to the disbursement of funds to the secured creditors and a request for an accounting.

Kahl Iron Foundry, Inc., hereinafter debtor, filed its Chapter XI petition under the Bankruptcy Act of 1898 on August 31, 1979. Thereafter, Herbert Keidan was appointed receiver for the company. At the first Chapter XI meeting, it became clear that the debtor had little or no corporate cash reserves.

King Scrap Iron and Metal Company, Inc., herein King Scrap, at all times previous to the filing of the petition had a security interest in:

"All inventory heretofore or hereafter acquired by Debtor; all equipment, furniture, fixtures, leasehold improvements or

other items of personality owned by the Debtor as well as any and all proceeds from the sale, exchange or other disposition of the above identified collateral; all accounts receivable, choses in action, stock, bonds, negotiable instruments or other intangible rights, presently owned or hereafter acquired by Debtor, as well as any and all proceeds from the sale, exchange or other disposition of the same..."

This security interest was given on August 15, 1977 and properly recorded and perfected on August 25, 1977.

In January of 1980, the debtor was adjudicated a bankrupt. The events leading to this adjudication are of importance and hence will be summarized below. It appears that from the time Keidan was appointed receiver, he believed that prospects for the rehabilitation of the debtor were essentially non-existent. His opinion was based on the fact that in order for the business to continue operations, it needed to meet EPA requirements for new pollution control equipment which would cost in excess of $100,000.00, and, as stated previously, this was a business with little or no cash reserves. Judge Hackett, in a meeting with Keidan and Stuart Hertzberg, the attorney for the debtor, insisted that Keidan attempt to rehabilitate the company and assured Keidan that the administrative expenses and fees would be paid. Although no formal order reflecting the above was ever entered, the testimony before this Court clearly indicates the same to be true. In order for Keidan to operate the business, it became necessary for him to purchase materials, negotiate contracts and acquire credit. Subsequently, it was determined that the business could not be rehabilitated and thus was adjudicated a bankrupt in January of 1980.

After the above-mentioned adjudication, Keidan was appointed trustee. He was directed to turn over to the secured creditors, National Acceptance Corporation and King Scrap, the property securing their loans. Keidan testified that he telephoned King Scrap and asked for a report as to whether the sale of the property resulted in a surplus or deficiency. King Scrap never responded to these inquiries either by submission of the report or by objections. Thereafter, Keidan paid approximately $15,960.38 to satisfy the expenses of administration.

The testimony before the Court indicates that most of the monies generated by the company arose during Keidan's term as receiver/trustee. Indeed, the company had been completely shut down in the two to three weeks prior to the filing of the petition except for the heating of the furnaces which, for a number of reasons, could not be abruptly terminated. Although certain schedules filed by the debtor reflected inventory with a value of $38,000.00, Keidan testified that there was no inventory when he was appointed. Any inventory obtained subsequent to his appointment was purchased by funds which had been borrowed pursuant to an order permitting borrowing entered by Judge Hackett in September of 1979.

The primary issue before this Court is whether the prepetition security agreement, with its after-acquired property clause, attaches to funds generated by the receiver of a debtor corporation and dispensed by him to pay administrative claims.

King Scrap maintains that its security agreement attached to the inventory created after the filing and therefore it had a lien on the proceeds from the sale of that inventory superior to the estate administration claims.

■ The parties agree that this action is governed by the Bankruptcy Act of 1898. Under the Act, a debtor in possession is not the same entity as the pre-bankruptcy company but is a new entity with its own rights and duties subject to the supervision of the Bankruptcy Court. *In Re CRS Architectural Metals Corporation*, 1 B.R. 729 (1979); *Shopmens Local Union No. 455, etc. v. Kevin Steel Products, Inc.*, 519 F.2d 698 (2d Cir. 1975). In regard to this, the debtor in possession is also a court officer analogous to a receiver or trustee in bankruptcy. *In Re Avorn Dress Co.*, 78 F.2d 681 (2d Cir. 1935); *In Re Austin*, 55 F.Supp. 462 (E.D.N.

Y.1944). As noted by counsel for the trustee, the case for finding the receiver a separate legal entity is relatively strong.

Counsel for King Scrap has cited several cases which it claims supports its position. See *Matter of Blazon Flexible Flyer*, 407 F.Supp. 861 (N.D.Ohio 1976); *Matter of American Kitchen Foods, Inc.*, et al., 2 Bank.Ct.Dec. 715 (N.D.Maine 1976). In *Blazon*, a secured creditor, Citicorp Business Credit, Inc., sought to prevent the debtor's use of accounts receivable and inventory in the course of the Chapter XI. The Court denied Citicorp's motion but noted that Citicorp was entitled to have a security interest not only in the accounts receivable as of the time Blazon filed its Chapter XI petition, but also future or after acquired receivables. The Court further noted that Blazon had an inventory of finished goods, work in process and raw materials in the approximate amount of $1,000,000.00 and also accounts receivable in the amount of $2,700,000.00. In *American Kitchen Foods*, two banks which were secured creditors of a Chapter XI debtor were secured by first liens on accounts receivable, proceeds, contract rights and other intangible personal property, inventory and proceeds, processing plant, equipment and fixtures. The Court allowed the debtor in possession to sell inventories and products, to collect upon accounts, and to use the proceeds with the liens attaching to the assets and proceeds existing or after acquired.

In both of the cases summarized above, the courts therein were dealing with an entity which was a going concern with a reasonable prospect of rehabilitation (*American Kitchen Foods*) or an entity which had a substantial inventory of finished goods, work in process, raw materials and accounts receivable (*Blazon*). Although it is not clear from the cases, an assumption can be made that the companies therein possessed inventories, goods and materials prior to the filing of the Chapter XI which were produced or purchased by way of loans from the creditors. The sale of these generated the accounts receivable to which the secured creditors' liens could attach.

In *Matter of Sequential Information Systems, Inc.*, 4 CCH Secured Transactions Guide (1969–1973 Transfer Binder) ¶ 479 (S.D.M.R.1970), the court held that a creditor's perfected lien on a debtors after-acquired property did not extend to the inventory acquired by the debtor in its capacity as a debtor in possession except insofar as such inventory was paid for with funds subject to the creditor's lien. The court reasoned the debtor in possession was a separate and distinct entity from the debtor and therefore not subject to the security interest. *Sequential Information Systems* is, therefore, not inconsistent with the cases cited by King Scrap. These cases deal with factual situations which fall into the exception enunciated in the *Sequential Information Systems* case. The factual situation herein clearly does not.

■ The testimony before this Court reveals a company which had ceased operations two to three weeks prior to the filing of the petition. The receiver/trustee testified that when he assumed control of the company, there were no accounts receivable and but a bag of sand as inventory. In his attempt to rehabilitate the company, large sums of money needed to be borrowed by the trustee/receiver. This money was then used to create new inventory, the sale of which created new accounts receivable. Although the schedules listed inventory of $38,536.45 and accounts receivable of $290,325.65, the trustee/receiver testified that he did not prepare the schedules and further that he found the schedules not to reflect the actual condition of the company.

It is evident, therefore, that the facts of this case do not rest within the exception as stated in *Sequential Information Systems* since none of the funds of the debtor subject to King Scrap's liens were used to acquire inventory to which the lien could attach. All funds used to acquire the inventory were borrowed by the trustee/receiver from National Acceptance Corporation.

This Court finds, therefore, that King Scrap is not entitled to a turnover of pro-

ceeds. The objections to the disbursement of funds to the unsecured creditors are dismissed as is the request for an accounting.

So ordered.