**In the Matter of Vincent A. DIAS, Cheryl A. Dias, Debtors.**

**Bankruptcy No. 82–01637.**

United States Bankruptcy Court, D. Idaho.

Nov. 19, 1982.

Randy J. Stoker, Twin Falls, Idaho, for debtors.

Jeffrey G. Howe, Asst. U.S. Atty., Boise, Idaho, for U.S., Farm Home Admin.

Cecil D. Hobdey, Hobdey & Varin, Gooding, Idaho, for Southern Idaho Production Credit Assn.

## MEMORANDUM DECISION

M.S. YOUNG, Bankruptcy Judge.

This matter is presently before the court upon chapter 13 debtors' request for authorization to use cash collateral under 11 U.S.C. §§ 363 and 1304.

Debtors operate a dairy farm near Wendell, Idaho. Debtors place the value of their dairy stock at $132,550 and the value of the dairy farm and farm equipment at approximately $185,000. Sale of the milk produced is the sole source of debtors' income and the sole means by which any plan in their chapter 13 proceeding can be funded. Debtors seek authorization of the court to use approximately $13,000 per month of cash proceeds of milk produced by debtor and sold to Kraft, which proceeds are cur-

rently subject to assignments in favor of two major creditors, the Farmers Home Administration (FmHA) and the Southern Idaho Production Credit Association (PCA). All dairy products are currently sold to Kraft and gross sales are approximately $2,000 to $3,000 per month greater than the assignments to FmHA and PCA. Debtors cannot meet their current operating expenses without use of the assigned cash proceeds from the milk. They will also be unable to satisfy the PCA indebtedness due in November, 1982.

The FmHA made four loans to debtors from September, 1978 through May, 1980. The current amount of outstanding loans owed FmHA is approximately $280,000. No present default exists because the loans required only annual payments. The sums advanced by FmHA are secured as follows.

The first loan in the original principal amount of $50,000 made in September, 1978, is secured by debtors' livestock, farm products [1], crops grown on land leased from Manual Dias, farm equipment, the proceeds of such collateral, and after-acquired property of the same nature. The security agreement provides that this collateral also secures future advances. This security interest was perfected by the filing of an appropriate financing statement. Approximately $15,000 remains due on this obligation. An annual instalment payment is due in January, 1983.

The second loan in the amount of $103,600 was made in September, 1979. No other or additional security agreement or financing statement was executed.[2] Some $60,000 remains due on this loan.

A security agreement was executed in regard to the third loan of $151,500 in October, 1979, by which FmHA received a security interest in milking equipment and in debtors' real property including the fixtures thereon. A financing statement was filed covering the equipment and a mortgage was executed and recorded encumbering debtors' farm. Approximately $145,000 remains due on this obligation.

The last loan of $90,000, made in May, 1980, was accompanied by another FmHA form security agreement pledging the same general collateral as the original agreement but which specified additional livestock and pledged crops grown on another parcel of land. No additional financing statement is of record.[3] Approximately $61,000 remains due on this loan.

Debtors also obtained a loan from the PCA evidenced by notes executed on November 13, 1981, in the original amount of $79,910 and in March, 1982, in the amount of $38,564, both of which are payable in November, 1982. A security agreement was executed in connection with the November, 1981, advance, which agreement pledged livestock, feed, and proceeds thereof as collateral for that and future ad-

1. Farm products include milk produced by debtors' stock. See I.C. 28–9–109(3); *Wade v. United States,* 82 IBCR 58 (April 8, 1982).

2. Debtors contend that the second advance was unsecured since no additional security agreement was executed. However, I.C. 28–9–204(3) provides for the securing of future advances as occurred here. See also Official Comment 5 to I.C. 28–9–204. The original security agreement adequately described the collateral and expressly provided that such collateral would secure later advances, and I conclude debtors' contention not well taken.

3. Debtors contend that any security interest granted in connection with the second or fourth loans are unperfected since no separate financing statements were filed. I.C. 28–9–303 provides that a security interest is perfected when it has attached and when all applicable steps required for perfection have occurred. In re-

gard to the collateral set forth in the original security agreement, e.g. livestock, farm products, equipment, perfection was achieved by the filing of the original financing statement giving notice of such security interests. I.C. 28–9–303(1), again in contemplation of continued financing arrangements, notes that if necessary steps for perfection have occurred prior to the time the security interest attaches, it will be perfected at attachment. See also Comment 5, I.C. 28–9–204, *supra.* The interests are therefore perfected without the need for filing an additional financing statement. However, to the extent the FmHA received, in regard to the last advance, a security interest in crops other than those originally pledged and identified on the original financing statement, the interest would be unperfected. I.C. §§ 28–9–302; 28–9–401(1)(a); 28–9–402(1).

vances. The date set forth on this security agreement reads "November 13, 1982".[4] A financing statement in favor of PCA is also of record. The current indebtedness to PCA is approximately $43,800.

FmHA subordinated its security interest to that of PCA by agreement dated February 26, 1982, in consideration of PCA's loan of $79,910 to debtors. The subordination agreement specified that it was in regard to FmHA's secured position in 1982 crops, livestock (except proceeds of culled cows), and equipment.[5]

PCA received an assignment of the proceeds from the sale of dairy products in March, 1982, in the amount of $7,426 per month.

Several assignments of cash proceeds from the sale of dairy products were received by FmHA. The last assignment supercedes prior assignments. It provides that debtors, in consideration of the advance of funds, assign and transfer to FmHA $5,658 per month of the purchase price of milk due or which may become due debtors from Kraft. This document provides that, in consideration of the acceptance of the assignment by Kraft, the FmHA releases any lien or security interest it has or may have in dairy products sold by debtors to, by or through Kraft.

Debtors seek permission to use these assigned funds on the theory that such moneys are cash collateral.

In *Wade v. United States,* 82 IBCR 58 (April 8, 1982) and *In re Wade,* 82 IBCR 105 (June 29, 1982), I held that the proceeds from the sale of milk produced by debtors' cows were property of the estate under §§ 541 and 1306, and the fact that a securi-

ty interest in the milk and the proceeds thereof continued to be effective under § 552(b) did not alter their character. Thus, since both the estate and an entity other than the estate had an interest in such funds, I held that they were cash collateral as defined by § 363(a) and that § 363(c)(2) was applicable.

FmHA contends that the assignments[6] of the funds received from the sale of milk operate, under state law, as absolute transfers of all debtors' interest therein, and as a result those funds are not property of the estate under § 541(a)(1) and thus not cash collateral subject to the provisions of §§ 363(c) and 1304. See generally *McCluskey v. Galland,* 95 Idaho 472, 511 P.2d 289 (1973); *Equitable Life Assur. Soc. of U.S. v. Bennion,* 81 Idaho 445, 346 P.2d 1053 (1959); *Casady v. Scott,* 40 Idaho 137, 237 P. 415 (1924); *Porter v. Title Guaranty & Surety Co.,* 21 Idaho 312, 121 P. 548 (1912). See also *In re Bargstedt,* 7 B.R. 556, 6 B.C.D. 1428 (Bkrtcy.M.D.Ga.1980). But see *In re Hurricane Elkhorn Coal Corp. II,* 19 B.R. 609 (Bkrtcy.W.D.Ky.1982) (though the assignment structured as absolute, it was part of a financing arrangement and operated as a security interest; a sufficient interest remained in debtor to find the assigned property was property of estate under § 541(a)(1)).

In this case, the loan documents grant FmHA a security interest in the milk and agreements, in conjunction with I.C. 28–9–306, creates one in the proceeds. Thus, an additional security interest in the milk proceeds by means of the assignment is superfluous. Also, under the terms of the assignment, the transfer is absolute and it contains no language indicating an intent to

---

4. Debtors argue that PCA has no such security interest at the present time since the agreement is dated November 13, 1982, a date yet to occur. While the agreement has been executed, value given, and rights in the collateral acquired, I.C. 28–9–203(1), debtors rely upon the last clause of I.C. 28–9–203(2) which provides:

> Attachment occurs as soon as all of the events specified in subsection (1) have taken place unless explicit agreement postpones the time of attaching.

I do not construe the clause "this agreement, made this 13th day of November, 1982" as an "explicit agreement" of postponement.

5. PCA has no security interest in crops, *supra,* and the subordination agreement has no effect in this regard.

6. There is no practical difference between the assignments to PCA and to FmHA, with the exception of FmHA's release of its security interest in the milk.

create a security interest. Indeed, by express language, FmHA released any security interest it had in the milk, and necessarily in the proceeds thereof, to the extent of the assignment. Because the loan payments are due FmHA annually, the assignment is apparently a device by which the FmHA as lender insures that the proceeds periodically received by debtors will be applied toward payment on the loan. I conclude the assignment does not constitute further security for the obligations.

Since the assignment is intended and operates as an absolute assignment of debtors' legal and equitable interest in the milk proceeds, they do not become property of the estate under § 541(a)(1). However, § 541(a)(1) is not the exclusive definition of property of the estate. The Code also provides, in § 541(a)(6), that the estate includes:

"Proceeds, product, offspring, rents, and profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case."

■ There is clearly a conflict presented between the effect of the transaction under state law, by which all right and interest in the proceeds is vested in the assignees, and the effect of § 541(a)(6) giving the estate an interest in those proceeds. By virtue of the Supremacy Clause, U.S. Constitution, Article VI, Clause 2, and the Bankruptcy Clause, U.S. Constitution, Article I, Section 8, Clause 4, I conclude the operation of § 541(a)(6) bringing such property into the estate must control. That otherwise valid contracts are altered by the intervention of bankruptcy is not a novel proposition, for example the effect and enforcement of agreements creating security interests are touched in myriad ways by the filing of a petition for relief under the Code. I conclude that, while under state law debtors have no remaining legal interest in such proceeds, the debtors' estate still includes such funds under § 541(a)(6) and the use thereof may be authorized upon compliance with the provisions of § 363. Such a result also comports with the general rehabilitative structure of the reorganization chapters of the Code. As I held in the *Day Resource and Development* cases, 21 B.R. 176, 82 IBCR 98 (Bkrtcy.1982), the use of such property should not be denied a debtor seeking to reorganize if other parties also having interests in such property can be adequately protected.

However, although I hold that milk proceeds are cash collateral as defined by § 363(a), it is clear that debtors in the case at bar cannot provide adequate protection under § 363(c)(2)(B) and (e). Debtors admit they will be unable to pay the loan obligations to FmHA and PCA even if they could receive and use the proceeds of the sale of the milk. In fact, as noted, the only payments to either creditor are from the assigned proceeds. Debtors admit the only possible way that they could continue to operate, even with the use of the moneys in question, would be to obtain an extension of their loans from the creditors who seek an order denying debtors the use of such funds.

■ I, therefore, conclude debtors may not use the proceeds from the sale of the milk to finance their dairy operation without the consent of FmHA and PCA. Counsel for FmHA and PCA may prepare orders in accord with this decision.