**In re Ward F. DELBRIDGE, Sr. and Brenda S. Delbridge, Debtor.**

**Bankruptcy No. 86–07734.**

United States Bankruptcy Court, E.D. Michigan, S.D., at Flint.

May 29, 1986.

Richard G. Stehno, Flint, Mich., and Martin W. Hable, North Branch, Mich., for Debtor.

Peter A. Teholiz, Lansing, Mich., for Federal Land Bank of St. Paul and Production Credit Ass'n of Mid-Michigan.

## MEMORANDUM OPINION WITH REGARD TO USE OF CASH COLLATERAL

ARTHUR J. SPECTOR, Bankruptcy Judge.

Question: Is the cup half full or half empty? Answer: yes.

The debtor in possession in this dairy farm Chapter 11 case strenuously argues that milk is not the product of a cow. Since about half of the published court opinions dealing with this logically preposterous proposition have adopted it, it must be conceded that the argument passes the straight-face test.[1] Of course, when this question is put to a lay-person, that is, someone not blinded or befuddled by excessive legal training, the response is blunt and distinctly to the contrary.[2]

What has the learned folk so confounded —has, so to speak, caused them to throw up their hands in "udder" frustration—is the application of a federal statute to a common fact of economic life down on the dairy farm. Most dairy farmers who find their unfortunate way into the bankruptcy court come encumbered by liens on all bovine animals, their proceeds and their products (which, I suspect, even they would have conceded—until their first meeting with their bankruptcy lawyer—includes milk).

In this case, the farmer is in hock to the omnipresent Federal Land Bank of St. Paul (F.L.B.) and Production Credit Association of Mid-Michigan (P.C.A.). The debtors moved for a determination that the post-petition milk is not encumbered by these lenders' pre-petition liens, 11 U.S.C. § 552,[3] or if they are, to permit its use pursuant to § 363(c). Here, the debtor, at the court's suggestion, as a fall-back position to its otherwise all-or-nothing stand that the post-petition milk was not encumbered at all, has made an offer of adequate protection for the use of the milk proceeds.

The proofs show that F.L.B. has a mortgage on the farm real estate and an assignment of the Michigan Milk Producers' Association (MMPA) checks to the debtor for MMPA's purchase of the farm's milk production. P.C.A. has a concededly valid and perfected security interest in the debtor's farm machinery, livestock, proceeds and products thereof, including milk and its proceeds.

Because the F.L.B. did not obtain a security interest in pre-petition livestock or their proceeds or products but only obtained an assignment of the debtor's pre-petition accounts receivable[4] earned or expected from MMPA, its rights are distinctly different from P.C.A.'s. Although not officially designated as a security agreement, if the intent of the parties was to secure F.L.B.'s right to the repayment of the obligation, the "assignment" may be considered as having granted the creditor a security interest in the property "assigned". UCC § 9–102; *In re Pendleton,*

---

1. An argument passes the straight-face test if it is one which a competent and ethical lawyer can make while maintaining a straight face.

2. Something which approaches "If the law supposes that, the law is a [another barnyard animal]...." C. Dickens: *Oliver Twist,* Chapter LI (1838).

3. Further reference to sections of the Bankruptcy Code will be stated as § ___, without reference to the title of the U.S. Code.

4. Mich.Comp.Laws § 440.9106; Mich.Stat.Ann. § 19.9106 (hereinafter UCC § ___-___) provides that:

"Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper whether or not it has been earned by performance. "General intangibles" means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money. All rights to payment earned or unearned under a charter or other contract involving the use for hire of a vessel and all rights incident to the charter or contract are accounts.

40 B.R. 306, 12 B.C.D. 1372 (Bankr.W.D. Ky.1984); *In re Dias,* 24 B.R. 542, 9 B.C.D. 1088 (Bankr.D.Idaho 1982); *In re Liles and Raymond,* 24 B.R. 627 (Bankr.M.D. Tenn.1982). Since no contrary intent is established here, it is assumed that F.L.B. has a security interest in the debtor's prepetition accounts receivable of MMPA.[5] *In re Jackels,* 55 B.R. 67, 69 (Bankr.D.Minn. 1985).

The debtor maintains that § 552(a) cuts off F.L.B.'s pre-petition lien on the MMPA accounts and that § 552(b)'s exception for "proceeds, product", etc. is inapplicable because post-petition accounts are not the products or proceeds of the pre-petition accounts. This crucial section of the Code states:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing

and based on the equities of the case, orders otherwise.

The debtor argues that since F.L.B. does not have a security interest in milk (either pre- or post-petition) the account arising from the sale of milk which comes into existence post-petition, is entirely separate from the collateral claimed by F.L.B. The debtor is correct. Furthermore, § 552(b)'s exception to the general rule that pre-petition liens do not attach to assets acquired post-petition is, as to F.L.B., unavailing because § 552(b) protects liens only on the proceeds of pre-petition milk checks actually received by the debtor. *In re Gross-Feibel Co., Inc.,* 21 B.R. 648, 9 B.C.D. 307, 6 C.B.C.2d 1239 (Bankr.S.D. Ohio 1982). Because of the self-executing nature of the milk check assignment, farmers never receive the part of the account which has been assigned, since the dairy sends those funds directly to the assignee. Thus, as a factual matter, there simply never are proceeds, either pre- or post-petition, of milk check assignments. Indeed, the debtor's proofs established that in the two months prior to the filing of the Chapter 11, due to the all-encompassing nature of the dairy assignments, it received no money whatsoever from the sale of milk. Therefore, I find that, for the purposes of this contested matter,[6] the F.L.B. has no lien on milk produced post-petition and therefore the relief requested by the debtor with respect to the F.L.B. should be granted.

P.C.A. is conceded to have a perfected pre-petition lien on the debtor's cows and their milk. The debtor argues, however, that § 552(a) limits that lien to the milk in being at the time the bankruptcy was filed, citing *In re Pigeon,* 49 B.R. 657, 12 B.C.D. 107 (Bankr.D.N.D.1985); *In re Serbus,* 48 B.R. 5 (Bankr.D.Minn.1984); *In re John-*

---

**5.** Since there was no evidence that the security interest was perfected prior to the bankruptcy, it will likely be vulnerable in the adversary proceeding already brought by the debtor against F.L.B. to determine the validity of the lien pursuant to Bankruptcy Rule 7001(2).

**6.** To obtain an order invalidating the lien, the debtor will have to succeed on the merits in the

adversary proceeding. Bankruptcy Rule 7001(2). Since this question arose in the context of an emergency hearing in the bankruptcy case which elicited only minimal proofs and for which opportunity to present competing evidence was limited, the serious step of invalidating the lien is not now appropriate.

*son,* 47 B.R. 204 (Bankr.W.D.Wis.1985); and *In re Lawrence,* 41 B.R. 36, 13 B.C.D. 108 (Bankr.D.Minn.1984); *also see In re Jackels, supra; In re Quaal,* 40 B.R. 619 (Bankr.D.Minn.1984). P.C.A. counters by citing *In re Nielsen,* 48 B.R. 274, 13 B.C.D. 109 (D.N.D.1984); *In re Rankin,* 49 B.R. 565 (Bankr.W.D.Mo.1984); *In re Potter,* 46 B.R. 536 (Bankr.E.D.Tenn.1985); *In re Hollie,* 42 B.R. 111, 13 B.C.D. 643, 13 C.B.C.2d 488 (Bankr.M.D.Ga.1984); and *In re Dias, supra,* which hold to the contrary.

Since none of the relevant terms in § 552(b) are defined in the Bankruptcy Code, reference should be made to state law, *In re Transportation Design & Technology, Inc.,* 48 B.R. 635, 637 (Bankr.S.D. Cal.1985); *In re Gross-Feibel Co., Inc.,* 21 B.R. at 649, n. 3, or at least to a legal dictionary. In fact, § 552(b) explicitly requires the court to look to "applicable non-bankruptcy law." Clearly, milk produced post-petition is neither a "rent", a "profit" nor an "offspring" [7] of a cow or of milk in being pre-petition. UCC § 9–306(1) states: " 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." A "proceed" of milk or of a cow, is the cash or the account one receives after its disposition by sale or otherwise. *See In re Bechtold,* 54 B.R. 318, 321 (Bank.D.Minn. 1985). The issue is thus whether milk which comes into existence post-petition is a "product" of a cow.

Most courts that have held that milk is indeed a product of a cow actually felt compelled to seek legal support for the proposition ... and found it in UCC § 9–109(3), which defines farm products to include "products of livestock in their unmanufactured states (such as ... milk)". *In re Rankin,* 49 B.R. at 570; *In re Johnson,* 47 B.R. at 206; *In re Potter,* 46 B.R. at 538; *In re Hollie,* 42 B.R. at 119; and *In re Dias,* 24 B.R. at 543. Moreover, the

Official UCC Comment to § 9–109(3) states that:

> Products of crops or livestock, even though they remain in the possession of a person engaged in farming operation, lose their status as farm products if they are subjected to a manufacturing process. What is and what is not a manufacturing operation is not determined by this Article. At one end of the scale, some processes are so closely connected with farming—such as pasteurizing milk or boiling sap to produce maple syrup or maple sugar—that they would not rank as manufacturing. On the other hand an extensive canning operation would be manufacturing. The line is one for the courts to draw. After farm products have been subjected to a manufacturing operation, they become inventory if held for sale.

From this it is clear that the drafters intended that milk not lose its status as a farm product at least through delivery of the raw milk to the dairy, as is the case here. As Michigan has adopted that section of the UCC, one can confidently pronounce that, at least under Michigan law, milk is a farm product.

Some courts have taken the position that notwithstanding the UCC definition of farm products, something is a product of collateral "for purposes of § 552(b)" only when the collateral is necessarily consumed or has its existence essentially and irrevocably altered during the manufacturing process. *In re Jackels, supra; In re Pigeon, supra; In re Lawrence, supra.* Thus they held that since a cow is neither consumed nor materially altered during the milking process, the milk is not a product. Some debtors take this hypothesis to its logical conclusion. In essence, this theory holds that a cow is a milk machine: the farmer puts feed in one end, waits awhile, and milk comes out the other. This process

---

**7.** "Rent" is "consideration paid for use or occupation of property". *Black's Law Dictionary,* 1166 (5th ed. 1979). A "profit" is "a right exercised by one man in the soil of another, accompanied with participation in the profits of the soil thereof. A right to take a part of the soil or produce of the land." *Black's* at 1090. According to my kindergarten teacher, a cow's offspring, i.e., a baby cow, is called a calf—not milk.

is no different, they argue, from the concept of work-in-process in fabricating plants. There, the lender typically has a security interest in equipment and inventory which consists of both raw material, such as steel, and work-in-process. If the debtor obtains new steel post-petition and shapes it into a product by use of its machinery, the lender's pre-petition lien on this new work-in-process is cut off by § 552(a) and not saved by § 552(b). *Cf. In re Kahl Iron Foundry*, 21 B.R. 372 (Bankr.E.D.Mich.1982).[8] In the case of a dairy farmer, the feed is the steel and the cow is the machinery. *But see In re K.L. Smith Enterprises, Inc.*, 2 B.R. 280 (Bankr.D.Colo.1980) (holding that hens are not "equipment" and the eggs they produce are "farm products", not "inventory").[9] They argue that milk is the product not of a cow—but of a farmer. Though this is an ingenious argument, it is its very genious which is its fatal flaw.

Courts ought not to use sophistry to turn what appears plain on its face into a conundrum. The argument that milk is a farm product for purposes of the UCC but is not a product for purposes of § 552(b) is reminiscent of Humpty Dumpty's statement to Alice: "When *I* use a word ... it means just what I choose it to mean—neither more nor less." L. Carroll, *Through the Looking Glass*, Chapter 6 (1872). "Definitions should not be too artificial. For example—'dog' includes a cat is asking too much of the reader; 'animal' means a dog or a cat would be better." *Memorandum on Drafting of Acts of Parliament and Subordinate Legislation* (1951), Department of Justice, Ottawa, Canada, *quoted in* Ritchie, *Alice Through the Statutes*, 21

McGill L.J. 685 (1975). *Also see* n. 2 *supra.* A common sense reading of the plain word "product" is all that ought to be necessary when applying a statute that simply is not ambiguous. Any ambiguity found by others is created only by going outside the statutory language for a peek at legislative history. But "[w]hen confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184, 98 S.Ct. 2279, 2296–97, 57 L.Ed.2d 117, 40 n. 29 (1978); *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1960); *contra In re Pigeon*, 49 B.R. at 659. The flaw in this theory, then, is that there is no need to consider the "purposes" of § 552(b): courts need only read it and apply it.[10]

I surmise that the real reason certain courts agonized over the meaning of this section is that they didn't like the result that would have occurred had they played the music the way it read. In their view, if the post-petition milk were indeed encumbered by the lender's pre-petition lien, the farmer would be considerably less likely to successfully reorganize. *See e.g. In re Lawrence*, 41 B.R. at 38. However, policy-based decision making, if defensible at all, is even less so where it is unnecessary. In this context, policy ought to be irrelevant, since § 552(b) itself contains ample room for the exercise of policy-anchored discretion. *See e.g. In re Vanas*, 50 B.R. 988 (Bankr.E.D.Mich.1985); *In re Johnson*, 47 B.R. at 207.

██ Just as the answer to the question of whether the cup is half empty or half

---

8. Although it was a case decided under the Bankruptcy Act of 1898, it is still good authority as the Code has effected no change in the law. *See* 4 *Collier on Bankruptcy*, ¶ 552.02 at 552–10 (15th ed. 1979).

9. That case also holds that eggs are the products of hens. Note that another bankruptcy court has been called upon to decide that wool is the product of sheep, stating that "... wool is a product of sheep as much as milk is a product of cows". *In re Mahleres*, 53 B.R. 86, 88 (Bankr. D.Colo.1985).

10. This is not to say that Learned Hand's "choke rule"—"there is no 'surer mark of oversolicitude for the letter [of the wording of a statute] than to wince at carrying out [its] purposes because the words used do not formally match with it.'"—does not have its valid uses. *Federal Deposit Ins. Corp. v. Tremaine*, 133 F.2d 827, 830 (2d Cir.1943), *quoted in In re Beker Industries Corp.*, 57 B.R. 611, 626 (Bankr.S.D.N.Y.1986). However, the rule should be used only sparingly. For the reasons which follow, I think its use is not appropriate in this context.

full is yes, the question of whether milk is produced by the cow or the farmer is yes. Neither is wrong. The cow can't make milk without being fed, cared for and milked. The farmer alone can't turn feed into milk any more than he can spin straw into gold. What any school child can see is that you need all of the above to produce milk for sale. That is not reason to say that milk is not a product of the cow; it's simply a reason to apply the "equities of the case" language found in § 552(b). While I share the concern expressed by those courts which felt that it is unfair to let the creditor with a pre-petition lien on milk walk away with the entire cash proceeds of milk produced largely as a result of the farmer's post-petition time, labor, and inputs, § 552(b) allows the court leeway to fashion an appropriate equitable remedy, without the need to mangle the English language or cause judicial decision-making to become the object of derisive laughter. Indeed, legislative history is emphatic on this point:

> The provision allows the court to consider the equities in each case. In the course of such consideration the court may evaluate any expenditures by the estate relating to proceeds and any related improvement in position of the secured party. Although this section grants a secured party a security interest in proceeds, products, offspring, rents, or profits, the section is explicitly subject to other sections of title 11. For example, the trustee or debtor in possession may use, sell, or lease proceeds, products, offspring, rents, or profits under section 363.

124 Cong. Rec. H11,097–98 (daily ed. Sept. 28, 1978); S17,414 (daily ed. Oct. 6, 1978); *also see In re Chaseley's Foods, Inc.*, 726 F.2d 303, 306 (7th Cir.1983).

Although it has been stated, and I agree, that courts should not establish a hard and fast rule or formula when exercising their equitable powers under § 552(b), *In re Vanas*, 50 B.R. at 997; *In re Johnson*, 47 B.R. at 207, it is often helpful if an easy-to-state and easy-to-apply rule can be formulated. The concepts of equity and mathematics are not necessarily mutually exclusive. In this day of Posnerian jurisprudence,[11] a rule based on sound economics is more desirable than one founded on nothing more than the judge's own policy predilections. With all due humility, I hereby announce what I hope is such a rule for application in this case and others like it.

"The purpose behind the 'equities of the case' rule of 11 U.S.C. § 552(b) is, in a proper case, to enable those who contribute to the production of proceeds during Chapter 11 to share jointly with pre-petition creditors secured by proceeds." *In re Crouch*, 51 B.R. 331, 332 (Bankr.D.Ore. 1985). Since it is established that the farmer's labor, post-petition raw materials and the cow are all integral components of a commercial dairy farming operation, the owners of those commodities, are, in essence, joint venturers in the process of the commercial production and sale of milk. The mathematical equation which follows is intended to yield an equitable division of the products of that joint venture. The formula is as follows:

$$CC = \frac{D}{(D+E+L)} \times P$$

where:   $CC$ = "cash collateral", i.e.: the amount of the milk check which is encumbered by the lender's lien;
$D$ = the average depreciation of the capital, i.e.: the cow;
$E$ = the farmer's average direct expenses such as for feed, supplement, and veterinary services;
$L$ = the average market value of the farmer's or his employees' labor (excluding labor in the production of feed); and
$P$ = the average dollar proceeds of the milk sold.

11. As this Court is in the Sixth Circuit, the eco-justice of Judge Posner, now holding sway in the neighboring Seventh Circuit, is, of course, not binding here; however, a trend is a trend. *See e.g. In re Glenn*, 760 F.2d 1428 (6th Cir. 1985), where our own circuit held that a rule of practical application is sometimes preferable to a cumbersome rule of perhaps greater theoretical purity. *Also see* Crovitz, "Winds of Change on the Bench", *Wall St. J.*, March 15, 1985, at 24, cols. 4–6.

■ The rule is easy to state. The lender is entitled to the same percentage of the proceeds of the post-petition milk as its capital contribution to the production of the milk bears to the total of the capital and direct operating expenses incurred in producing the milk. Because the parties are in a direct mathematical relationship, the rule should be easy to apply. Very simply, the larger is the lender's capital contribution to the venture, the larger its share of the proceeds ought to be. Conversely, if the farmer's input in the venture is great, the "equities of the case" compel that his share of the proceeds likewise be great.

■ The term "cash collateral" was used purposely. The cases which hold that the lender's pre-petition lien on milk continues on milk produced post-petition also hold that the post-petition milk constitutes "cash collateral", as defined by § 363(a). That section defines "cash collateral" as "cash ... whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds ... of property subject to a security interest as provided in section 552(b) ...". *See e.g., In re Johnson, supra; In re Hollie* 42 B.R. at 120; *In re Dias, supra.* Because such milk constitutes cash collateral, it may not be used without either the lienor's consent or the order of the court. § 363(c). The court should only order the use of the cash collateral if the lender is adequately protected for it.[12] *In re George Ruggiere Chrysler-Plymouth,* 727 F.2d 1017 (11th Cir.1984); *In re Hollie, supra.*

■ To determine the amount of the P.C.A.'s lien on post-petition milk, that is, the cash collateral in question, using a monthly accounting basis, and upon the testimony received at the hearing, the formula yields this result in this case. The cows which are presently being milked are worth $800 each. Their average useful life is something less than 6 years; thus each is depreciating (on a straight-line basis) at the rate of about $12 per month. That is the capital contribution per cow by P.C.A. in this joint venture. Each cow is fed about $17 worth of feed and supplements and receives less than $2 worth of veterinary care per month.[13] The labor expended by the farmer's family per milk cow is 8 hours per month at a wage rate of $3.50 per hour; thus, the labor cost is $28 per cow per month. Therefore:

$$CC = \frac{12}{12+19+28}$$

of the milk check due the debtors; that is 12/59, or about 20%. Thus, I hold that until the further order of the Court based upon any changed circumstances which may arise, P.C.A. is entitled to a lien on 20% of proceeds of the sale of milk from the debtor's post-petition operations.

■ If the debtor's proposal for protecting P.C.A. for the debtor's use of this cash collateral is adequate, then notwithstanding the lien, the debtor may obtain an order allowing its use. *In re George Ruggiere Chrysler-Plymouth, supra; In re Johnson, supra.* The debtor proposes that its equity in the livestock and the farm machinery which are encumbered by P.C.A. is in and of itself sufficient to adequately protect P.C.A. from any loss which might be occasioned by the debtor's use of the entire milk check. Based upon the uncon-

12. This provision provides courts additional wiggle room to ameliorate the perceived harshness of holding that the lender has a lien on post-petition milk production.

13. Mr. Delbridge testified, in response to my questions of him, that these were his estimated actual costs. It was quite apparent that he had only the foggiest notion of what his costs really are. The estimate of the cost of feed per cow, which seems ridiculously low, is based on these calculations: total annual planting and harvesting expenses to grow hay and corn for feed is $1,850, which equates to $154 per month. The monthly deduction from the milk check for concentrate is $27.30. The purchase of additional hay costs another $660 per month. When these total costs are divided by the 49 animals which share the feed, it computes to an average of $17.17 each. In addition, because the debtor has had so little money with which to work, veterinary bills are now less than $2 per cow.

tested proofs elicited at the hearing, I find the value of the equipment to be $37,000 and the value of the livestock to be $28,000. Thus, P.C.A.'s claim of $25,000[14] is secured by $65,000 worth of collateral separate and apart from the lien on post-petition milk. The debtor also offers periodic payments of $61.75 per month[15] as further adequate protection. On this record, we find that the proposal does constitute adequate protection, as defined by § 361, of P.C.A.'s post-petition lien on milk and its proceeds.

Accordingly, the debtor's motion for use of P.C.A.'s cash collateral in the form of milk check assignments is hereby granted upon condition that the debtor enter into a new milk check assignment for the payment of $61.75 per month to P.C.A. The order shall explicitly state that it is subject to modification upon motion of either party as circumstances in the case change. Further, the debtor may submit an order declaring F.L.B. to have no lien on milk produced post-petition which is worthy of protection pursuant to § 363(c) of the Bankruptcy Code. This order shall expressly state that it is without prejudice to the rights of F.L.B. in any adversary proceeding involving a determination of the extent, priority or validity of its alleged lien.

---

**14.** It is unclear whether or not the $25,000 the debtor claimed is owed to P.C.A. includes interest to the date of the petition. Because of the early stage of these proceedings, P.C.A. has not yet filed a proof of claim on its own.

**15.** Without endorsing the logic, I note that the debtor arrives at this unusual sum as follows: "The sums of $475 (all PCA bargained for per month) × 12 months × 13% interest per annum — by 12 = $61.75 per month …". Apparently, P.C.A.'s dairy assignment was for an amount not exceeding $475.00 per month. The dairy assignment is, in the context of these types of cases, superfluous, since P.C.A.'s rights originate from its security agreement on pre-petition milk and proceeds. *See In re Rankin, supra; In re Beattie,* 31 B.R. 703, 713 (Bankr.W.D.N.C.1983).