**Ward F. DELBRIDGE, Sr., and Brenda S. Delbridge, Plaintiffs,**

v.

**PRODUCTION CREDIT ASSOCIATION AND FEDERAL LAND BANK, Defendant.**

No. 86–CV–40441–FL.

United States District Court, E.D. Michigan, S.D., Flint.

May 26, 1989.

---

1. That sounds better than calling the entry of the Court's order a meaningless gesture or without significance.

Richard Stehno, North Branch, Mich., for plaintiffs.

Peter A. Teholiz, Lansing, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

This is an appeal from an order of the Bankruptcy Court, dated July 8, 1986, which permitted the use of cash collateral pursuant to 11 U.S.C. §§ 363(c) and 552(b). In the alternative, appellant (hereafter PCA) challenges the formula devised by the Bankruptcy Court as a measure of the amount of proceeds which could be retained by the debtor as cash collateral and the amount found to constitute adequate protection for PCA.

The debtors in the matter are dairy farmers who obtained a loan from PCA. A security agreement was entered into by the parties, and PCA's security interest was perfected properly in the debtors' farm machinery, livestock, proceeds and products, including milk and its proceeds. The debtors assigned to PCA $475 of the proceeds from the sale to the Michigan Milk Producers' Association of their herd's milk. The Bankruptcy Court concluded that the proceeds from the sales of the milk continue to be assigned after filing of the bankruptcy petition, pursuant to 11 U.S.C. § 552(b), and the parties have not challenged this finding. 11 U.S.C. § 552(b) provides:

> (b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the

estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

The Bankruptcy Court reasoned that milk which comes into existence after the bankruptcy petition is filed, is a "product" of a cow,[1] the sale of which yields "proceeds" within the meaning of the Uniform Commercial Code (UCC) § 9–306(1). *Mich. Comp.Laws Ann.* § 440.9306(1). Thus, under § 552(b), PCA would continue to have the right to receive its monthly milk assignment checks, its interest being perfected. The Court then proceeded to remedy what it considered an inequitable result by invoking the equity exception in § 552(b).

PCA argues that the lower court improperly invoked the equity exception in awarding the debtors the use of cash collateral, and that even if properly invoked, the lower court's formula for determining the amount of cash collateral to be used by the debtors was improper.

The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtors-in-possession's use of other assets of the estate (which would normally go to general creditors) to cause the appreciated value. S.Rep. No. 989, 95th Cong., 2d Sess. 91, *reprinted in* 1978 *U.S. Code Cong. & Admin.News* 5787, 5877. For example, if a creditor had a security interest in raw materials worth one million dollars and the debtor invested $100,000 from the general estate funds to convert those materials into a manufactured good worth 1.5 million dollars, it may be inequitable to let the secured creditor benefit

from the entire proceeds of the sale, since the general creditors contributed to the appreciated value. *J. Catton Farms v. First National Bank of Chicago*, 779 F.2d 1242, 1247 (7th Cir.1985). The debtors here do not seek to use the general creditors' or estate funds to increase the value of the collateral. Instead, the Delbridges are attempting to use funds, which would otherwise go to PCA, a secured creditor, to facilitate the production of milk. Furthermore, equity should be involved only when there is no adequate remedy at law. *In re Johnson*, 47 B.R. 204, 207 (W.D.Wisc.1985). Here, the debtors may properly seek relief under other provisions of the Bankruptcy Code, namely § 363 or § 506. Accordingly, the bankruptcy court should not have proceeded under the equity exception to § 552(b).

Next, the lower court evaluated whether the debtors should have the use of cash collateral under § 363(c) of the Code which provides:

(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203, or 1204 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

§ 363 further states that in allowing the use, sale or lease of property, the court

---

1. In making this determination, the lower court adopted the UCC's definition of farm products, which specifically includes milk. The court rejected a line of cases that holds that milk is not a product unless its existence is essentially and irrevocably altered during the manufacturing process. These cases further reason that milk production may be analogized to the work-in-process concept used in fabricating plants. The cow is viewed as a "milk-machine," which produces milk after it is "fed" by raw materials (grain). Thus, the cases conclude that after-acquired raw materials which result in "new" milk production, would effectively cut off the lender's lien under 11 U.S.C. § 552(a) and would not be saved by § 552(b). This would allow the debtor use of the proceeds.

must ensure that an entity with an interest in such property should be adequately protected prior to allowing any action under this section. The trustee has the burden of proof on this issue. § 363(e, *o* ). Therefore, the principal question here is whether the creditor's security interest is "adequately protected" absent the receipt of cash collateral flowing from the use of the milk proceeds. Cash collateral is defined as "cash ... whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds ... of property subject to a security interest as provided in section 552(b) ..." The lower court set forth a formula for determining the amount of cash collateral to which the debtors would be entitled should their motion be granted. This amount was equated to PCA's lien on the post-petition milk.[2] The lower court reasoned that, essentially, the parties were acting in a joint venture relationship, and the formula enunciated was designed to effect an equitable distribution of the proceeds of this venture.[3] The formula is:

$$CC = \frac{D}{(D + E + L)} \times P$$

CC = cash collateral, or the amount of the milk check encumbered by the lender's lien;

D = the average depreciation of the capital, i.e., the cow.

E = the farmer's average direct expenses, such as for feed, supplement and veterinary services;

L = the average market value of the farmer's, or his employees' labor (excluding labor for the production of feed); and,

P = the average dollar proceeds of the milk sold.

(Memorandum Opinion, May 29, 1986, p. 11, [61 B.R. at 490] Record on Appeal). The lower court thus concluded that: "[t]he lender is entitled to the same percentage of the proceeds of the post-petition milk as its capital contribution to the production of the milk bears to the total of the capital and direct operating expenses incurred in producing the milk." *Id.* The appellant challenges this formula on several levels. First, PCA argues that the formula is dependent upon a farmer's expenses and his labor. Accordingly, a lienor would be punished, in the sense that the farmer who is inefficient will utilize more resources to produce the same amount of milk that a more efficient farmer could produce for less money. PCA further argues that while a farmer is bound by good faith to use only what is necessary in the way of cash collateral, a farmer potentially could effect an increase in the amount of collateral which he is to receive. Thus, PCA states that the Bankruptcy Court's reasoning would allow the farmer to be rewarded for a greater amount of input into his operation and thus is not sound inasmuch as the "greater input" can be attributed to inefficiency.

It should be kept in mind that the inquiry regarding the use of cash collateral should focus on whether the creditor is adequately protected should the debtor be allowed to use the proceeds. *In re Johnson, supra.* As noted above, the burden of proof on this issue is with the debtor. Since the lower court premised its determination of adequate protection upon the formula that it conceived, and because the testimony elicited from Mr. Delbridge was geared more toward his expenditures than his assets, it is not altogether clear whether the debtors sustained their burden. Adequate protection under § 363(e) is intend-

---

**2.** *See* p. 12 of the May 29, 1986 decision of the Bankruptcy Court [61 B.R. 484, 491] found in the record on appeal. The writer assumes that the court is referring to the *proceeds* of the sale of the post-petition milk and not the milk itself.

**3.** PCA objects strenuously to the lower court's use of this analogy, inasmuch as PCA has a debtor-creditor relationship and not a partnership relationship with the debtors and because PCA is a federally chartered corporation whose purpose it is to make loans to farmers. 12 U.S.C. § 2091. PCA notes correctly that it would have no right beyond repayment to share in any gains relating to the debtors' farming operation, nor would it have input into the business decisions made by the farmer regarding the operation of the farm. Thus, it should not have to assume the risk that an operation will fail because of the farmer's misjudgment. The creditor's argument is well-taken.

ed to ensure that the secured creditor receives in value essentially what he bargained for. H.R.Rep. No. 595, 95th Cong. 1st Sess. 338–39 (1977), *reprinted in, U.S. Code Cong. & Admin.News*, 1978, p. 5787, 6294–6296. However, "the creditor's right to adequate protection is limited to the lesser of the value of the collateral or the amount of the secured claim ... [and] to the extent that the [creditor's] lien claim exceeded the value of the Debtor's collateral on the day of the filing, the claim was an unsecured claim. ... one which was not entitled to adequate protection." *In re Aegean Fare, Inc.*, 33 B.R. 745 (Bankr.D. Mass.1983).

Obviously, if the debtors' dairy operation ceased to exist and the proceeds were cut off, so would the creditors' interest in the proceeds, since there would be no post-petition proceeds. So it can be seen that the formula of the bankruptcy judge is an equitable attempt to distribute the proceeds of the assignment check.[4] As to the debtors' argument that a farmer would be able to manipulate [5] that amount of cash collateral it could receive, it should be noted that none of the cash collateral is based on a calculation of profit, but rather, on operating expenses. Thus, it would be in the farmers' best interest to spend their money wisely.

Ultimately, as noted below, the award of cash collateral was based on an offer of adequate protection of $61.75 made by debtor, which is in addition to the creditor's lien on the value of the equipment ($37,000) and the value of the livestock ($28,000). The value of PCA's claim was $25,000 at the time of filing. The findings of the Bankruptcy Court are based on the debtors' testimony and PCA offered no proofs to the contrary; hence, this Court cannot say that these findings are clearly errone-

ous. Therefore, the creditors were adequately protected, and the decision of the Bankruptcy Court is hereby AFFIRMED.

SO ORDERED.

---

**4.** One thing is not clear in the lower court's application of the formula. The court ended up with a 20% cash collateral figure, to which the debtors would be entitled. However, in the next sentence it is stated that "P.C.A. is entitled to a lien on 20% of proceeds of the sale of milk from the debtor's [sic] post-petition operations." This may have just been a misstatement by the court. Memorandum Opinion 61 B.R. at 491. Nevertheless, the figure used ultimately was not

based on the formula at all, but on an offer made by the debtors after the hearing, based on the interest due on its note.

**5.** The ability of the operating debtor to dishonestly manipulate is inherent in any arrangement whereby a debtor continues to operate. Such ability to manipulate would thus negate all business operations under the Bankruptcy Act and negate its rehabilitative purposes.