## No. 21272.

HUGH WEED, DIRECTOR OF REVENUE OF THE STATE OF COLORADO, ET AL., v. MONFORT FEED LOTS, INC.

(402 P.2d 177)

Decided April 5, 1965.    Rehearing denied June 7, 1965.

578

Duke W. Dunbar, Attorney General, Frank E. Hickey, Deputy, Richard L. Eason, Assistant, for plaintiffs in error.

Melvin Dinner and Donaldson, Hoffman & Goldstein, for defendants in error.

*En Banc.*

Mr. Justice McWilliams delivered the opinion of the Court.

The issue posed by this writ of error is whether the ton mile tax as provided by C.R.S. '53, 13-5-23 (1960 Perm. Supp.) is applicable to certain motor vehicles

owned by persons who are engaged in the business of operating feed lots where cattle are "finished" for market.

In 1961 Monfort Feed Lots, Inc., a Colorado corporation, S. Weisbert & Company, also a Colorado corporation, S. Weisbert & Company, a partnership, and Sam Weisbert, Inc., a Colorado corporation, brought the present action against the Director of Revenue, the Chief Port Officer, and the Treasurer, all of the State of Colorado, alleging that the plaintiffs by virtue of C.R.S. '53, 13-5-23(3)(e)(II) were exempt from the ton mile tax. The plaintiffs then went on to allege that, notwithstanding this exemption, by reason of demand, duress, force and threats of distraint and seizure on the part of the several defendants they paid the aforementioned ton mile tax from 1955, when this particular tax was enacted into law by the General Assembly, till the date when their complaint was filed. Accordingly, each of the plaintiffs sought a determination that they were exempt from the ton mile tax and also a return to them of all monies previously paid the defendants under said C.R.S. '53, 13-5-23.

By answer the defendants denied, among many other things, that the plaintiffs were exempt from the aforementioned tax.

The "exemption" with which we are here concerned is found in 1960 Perm. Supp., C.R.S., section 13-5-23(3) (e)(II) and reads as follows:

"This paragraph (e) of subsection (3) shall not apply to motor vehicles owned by a farmer or rancher and used principally for transporting produce to market or place of storage or for transporting feed, supplies, or produce required in the operation of such farm or ranch; . . . ."

Upon trial it was determined by the trial court that the plaintiffs were "farmers and ranchers, or one of them" and as such exempt from the gross ton mile tax.

Accordingly, judgment duly entered in favor of Mon-

fort Feed Lots, Inc., in the sum of $211,439.57, which was the total amount paid by said corporation from 1955 to the date when this action was commenced. Similarly, S. Weisbert & Company, a corporation and S. Weisbert & Company, a partnership were awarded a judgment in the amount of $16,160.52. Finally, Sam Weisbert, Inc., received judgment in its favor in the sum of $33,670.87. By writ of error, the Director of Revenue and the other state officials now seek reversal of these judgments. ·

As noted above, the dominant issue is whether the plaintiffs brought themselves within that class of persons who are exempt from the ton mile tax. Stated differently, are the plaintiffs either farmers or ranchers, or both, and therefore exempt under the terms of the statute from the payment of this tax?

■ In this regard it is suggested by counsel that the finding of the trial court that these plaintiffs were farmers and ranchers *must* be sustained by us on review if there be any competent evidence to support the same. We do not so view the matter. This is not an instance where a trial court sitting as the trier of the facts has made a determination of fact based on conflicting and disputed testimony. Rather, this is a situation where the evidence is *undisputed,* and the only dispute is as to the legal significance of these undisputed facts. In other words, there is no dispute as to the method of operation of these several plaintiffs, and hence it then becomes a *matter of law* as to whether in view of what they do and how they do it they are farmers or ranchers. See *McIntosh-Huntington Co. v. Rice,* 13 Colo. App. 393, 58 Pac. 358 and *Radke v. Union Pacific Railroad Company,* 138 Colo. 189, 334 P.2d 1077.

As already noted, there is no dispute as to the nature of the business carried on by the plaintiffs or their method of operation. Indeed such was the subject of a detailed stipulation by and between all parties to this litigation. From that stipulation we learn that the plaintiffs are essentially engaged in the business of buying

calves and yearlings, fattening them on specialized diets in their respective feed lots, and then transporting the "finished cattle" to the stockyards and slaughter houses in the Greeley and Denver areas. By way of example, let us look more closely at the spread of Monfort Feed Lots, Inc., a Colorado corporation.

The center of Monfort's feed lot operation is a 140 acre tract located just outside Greeley, Colorado, on which tract are located its livestock lots and pens. These lots and pens are used for the care and feeding of livestock, primarily cattle steers and heifers, which are purchased as calves and yearlings by Monfort from various farmers and ranchers. These cattle are fed and fattened in the aforementioned lots and pens and, when ready for market, they are then sold by Monfort to the stockyards or slaughterhouses. The average number of livestock marketed by Monfort each year is stipulated to be 35,000 head.

It is at once obvious that a tremendous supply of feed and grain is necessary to maintain an operation of this size. No crops of any type are grown on the 140 acres where the lots and pens are located, and hence all feed must be hauled in from outside sources. Monfort itself owns 390 acres in Weld County, some of which is irrigated, and produces thereon various feed crops, such as alfalfa, hay, and small grain, all of which is used in its feed lot operation. Additionally, Monfort contracts with the owners of some 3000 acres of land situate around the surrounding countryside under an arrangement whereby it furnishes the seed and later harvests the crops which are then fed to its cattle in the feed lots, with the crops themselves being planted, cultivated and grown by the owners of said land. Also, Monfort has other contracts calling for the alfalfa crop from approximately 2000 acres of land belonging to neighboring farmers which it harvests and feeds to its cattle upon its feed lots. Even all of this does not begin to feed the cattle maintained by Monfort in its pens, and hence it is compelled to pur-

chase the bulk of its feed from various other suppliers, with about 50% thereof being brought in from outside the State.

In order to transport all of this livestock and feed Monfort owns and operates a large fleet of trucks. The present controversy concerns whether Monfort must pay the ton mile tax on certain trailers, semi-trailers and tractors which are used by Monfort in the hauling of feed to the feed lot and also in the hauling of the "finished" cattle to the stockyards and slaughterhouses. At the time this action was commenced Monfort was using some 15 tractors, 23 trailers and 4 tractors with trailers, and during the two-year period from June 1961 to June 1963 operated 22 such tractor-trailer units over the highways of Colorado. These units ranged in empty weight from 20,600 pounds to 27,000 pounds and during this period of time from June 1961 to June 1963 carried a total of 280,000,000 pounds of cargo over a total of something over 1,000,000 miles of highway. The total number of miles traveled by these units was over 2,000,000 miles.

Without detailing the exact manner in which the other plaintiffs conduct their business operation, it is deemed sufficient to observe that they operate in essentially the same manner as does Monfort.

■■ It is apparent that the object and purpose of the ton mile tax statute is to regulate the use of our public highways and provide funds for highway maintenance and construction by taxing those who are heavy, constant and continuous users of our highways in proportion to their use thereof. As previously mentioned, the applicable statute does, however, exempt from the operation of the ton mile tax "motor vehicles owned by a farmer or rancher and used principally for transporting produce to market or place of storage or for transporting feed, supplies, or produce required in the operation of such ranch or farm."

■ In *Carpenter, Director of Revenue v. May Department Stores Company,* 111 Colo. 479, 143 P.2d 270, this

Court stated that "where a taxpayer claims an exemption under a taxing statute, the burden is on him to clearly establish the right to such exemption . . . ." See, also, in this regard *Bedford v. Hartman Brothers, Inc.*, 104 Colo. 190, 89 P.2d 584.

■■ Or, as was said in *Jones v. Iowa State Tax Commission*, 247 Iowa 530, 74 N.W.2d 563, where the Iowa Supreme Court stated:

"Taxation is the rule and exemption therefrom the exception; and the claimant of such an exemption must show his right thereto by evidence which leaves the question free from doubt . . . . The claimant for exemption must show that his demand is within the letter as well as the spirit of the law . . . ."

In the instant case have Monfort and the other plaintiffs shown that they are farmers or ranchers within both the spirit as well as the letter of the law? Have they established their right to an exemption from the tax "by evidence which leaves the question free from doubt?" We now hold that they have not. In our view the several plaintiffs have not only failed to show that they are farmers or ranchers within the meaning of this taxing statute, but in the process of attempting to do so they have demonstrated that they are *not* farmers or ranchers, but "feed lot operators."

Mr. Kenneth Monfort, vice-president of Monfort Feed Lots, Inc., a Colorado corporation, was called as a rebuttal witness and upon direct examination he gave considerable insight into the business of operating feed lots, which though partaking of some of the traditional aspects of farming or ranching, is still something new and different therefrom. In this regard, Mr. Monfort testified as follows:

"Basically the feeding of cattle originated, I would say, in northern Colorado as a basis for using the roughage type feeds. This would be feeds with quite a bit of fiber that were grown in the area, alfalfa, hay, corn ensilage, and at that time wet beet pulp. Well, the feeding

industry grew in northern Colorado the same as the sugar industry did because of the demand for what we would call feed beef. This would be beef that we would grade choice. The cattle feeder will buy cattle off a ranch, off a dry pasture somewhere, cattle that would grade utility and would be much the same as cow beef or some of what we are importing now from other countries, and by the process of feeding them carbohydrates and protein and fiber roughage they will put marbling in this meat to where it will grade choice.

"Now, Weld County is the third largest cattle-feeding county in the country. Imperial County is the largest, in California, and Maricopa, which is the county around Phoenix, is the second largest, but these areas have developed their feeding because of climate, because of proximity of these various feeds that make up the ideal type of feed. For instance, our feeding operation, or a much smaller operation—all of them—we are concerned with what we would call a balanced ration. This balanced ration has to have carbohydrates, it has to have protein; and it has to have fiber. The carbohydrates are provided by the grain, the corn, the milo and barley. The protein is provided by mixed supplement. We have three or four places in northern Colorado that mix this supplement. It is basically soybean meal, safflower meal, cottonseed meal, and in addition to this, why, certain antibiotics and the like are added. This is where the protein comes from. The roughage, the fiber, comes from the locally-produced silage and alfalfa hay.

"But cattle feeding, I think, probably is the biggest single phase of agriculture now. I think it has surpassed the rearing and raising of pork. For instance, I noticed in the paper last night that Colorado ranks sixth, I believe, in the feeding of cattle, the number one state being Iowa, and the second state is Nebraska, and the third state is California. I don't know if I'm saying what I should."

■ In *Public Utilities Commission v. Manley*, 99 Colo.

153, 60 P.2d 913 we held that the exemption of farmers from the ton mile tax enacted by the General Assembly in 1935 was not discriminatory, and in so holding we made the following comment:

". . . . Whether their use of the roads is an increasing or diminishing proportion of the use of the highways; whether it is still no more than 'a simple and normal, traditional and necessary use' of the highways, to use the words of the Supreme Court of Wisconsin in *State ex rel. v. Public Service Com.*, 207 Wis. 664, 242 N.W. 668; the kind and character of motor vehicles commonly used by farmers as a class; their relative destructive effect on the highways as compared with the kind and character of motor vehicles commonly used by other commercial carriers; the relative amount of the burden of road taxation for public highways borne by farmers as a class as compared with that borne by other commercial carriers; the use of the highways whether seasonal or continuous, are all matters proper for consideration by the legislature in determining the need for regulation and an equitable imposition of the tax burden for the use of the highways. Upon consideration of these things we cannot say that the exemption is clearly discriminatory, which we must be able to do before we are authorized to hold the act void."

It was on this basis, then, that the aforementioned exemption of farmers from the 1935 ton mile tax was found to be proper and non-discriminatory. In our view for us to now hold that Monfort Feed Lots, Inc., a Colorado corporation, and the other plaintiffs in the instant case are farmers or ranchers would do violence to the underlying reasoning and basis for our decision in the *Manley* case.

The judgment is reversed and the cause is remanded with directions to the trial court to enter judgment in favor of the defendants.