In re K. L. SMITH ENTERPRISES, LTD., Debtor.

K. L. SMITH ENTERPRISES, LTD., Plaintiff,

v.

UNITED BANK OF DENVER NATIONAL ASSOCIATION, a National Banking Association, and Lux Pullets, Inc., an Iowa Corporation, Defendants.

Bankruptcy No. 79 K 0187.

United States Bankruptcy Court, D. Colorado.

Jan. 22, 1980.

James M. Lyons, and Garry R. Appel, Rothgerber, Appel & Powers, Denver, Colo., for plaintiff.

Donald K. Bain, Holme, Roberts & Owen, Denver, Colo., for defendant United Bank of Denver Nat. Ass'n.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW UPON NATURE, EXTENT, AND VALIDITY OF LIEN HELD BY UNITED BANK OF DENVER

GLEN E. KELLER, Jr., Bankruptcy Judge.

THIS MATTER came before the Court upon the complaint of the Debtor to deter-mine the nature, extent, and validity of a claimed lien by the United Bank of Denver in certain property and certain cash. The complaint involves other issues as well, but they have been deferred for later trial due to the need for immediate determination of whether the cash in the possession of the Debtor constitutes "cash collateral" pursuant to 11 U.S.C. § 363 and, if so, whether there are appropriate conditions for the use of such cash collateral in the operation of the Debtor's business pursuant to 11 U.S.C. § 552.

The facts are in large measure undisputed. The principal officer of the Plaintiff over a number of years pioneered a method of housing laying hens and collecting eggs which is, by all accounts, unique in the industry. The chickens are housed in "egg production units," which are large, circular structures containing four concentric circles of caged hens, 10 tiers high. The circles revolve through the building, passing stations for feeding, watering, egg collection, and manure removal. The chickens pass a collection station, which consists of an elevator which the operator rides up and down among the tiers, hand collecting the eggs. After the eggs are collected, they are cooled and then processed by washing, spraying with a light oil to seal the shell, and "candling." The candling operation is nothing more than passing the eggs in a rotating fashion over a light to detect cracks or other defects which render the egg non-marketable to the consumer trade. The eggs are then sized by weight and packaged in cartons. Where appropriate, the cartons of the customer, which have been preprinted, are used, and on other occasions, the eggs are packaged in 30-dozen cartons, where they are separated by layers of fiberboard. On some occasions, the Debtor does not put the eggs through the entire process of candling, washing, and oiling and sells the eggs as "nest run eggs," which puts the processing burden upon the purchaser.

The United Bank of Denver loaned the total principal sum of $2,400,000.00 to the Debtor on November 5, 1976. Four sepa-

rate security agreements were executed in connection with this loan, two of which have specific application here. The first grants to the Bank a security interest in all inventory, accounts and contract rights of the Debtor, plus the proceeds therefrom. The second gives the Bank a security interest in all equipment and machinery of the Debtor. Appropriate financing statements were filed in the requisite offices to perfect the security interest in all of the described collateral.

The Bank became concerned about the Debtor's financial condition in the spring of 1979. Its concern became progressively more pronounced until, on September 21, 1979, the Bank forced the resignation of Kenneth L. Smith as the president and executive officer of the Debtor. The Bank then arranged for Mr. Norman Bell to serve as the Debtor's chief operating officer. Thereafter, and until November 23, 1979, Mr. Smith was not active in the operations of the Debtor's business and was without authority. The petition herein was filed November 23, 1979, and Mr. Smith thereupon resumed active operation of the Debtor's business.

The Debtor's primary customer for a number of years had been Safeway Stores, Inc. Safeway and the Debtor had a written contract, pursuant to which all of the Debtor's egg production meeting minimum standards was sold to Safeway. On September 24, 1979, Safeway Stores gave notice of its cancellation of the contract effective 30 days later in accordance with the termination clause in the contract. Safeway did continue to buy eggs, however, by sending inspectors to the egg facility and selecting eggs which would be purchased from time to time. On November 19, 1979, Safeway took delivery of an egg shipment which was not invoiced until November 24, 1979, pursuant to the routine billing practices of the Debtor. In addition to the receivable for the eggs shipped on November 19th, the Debtor had at the close of business on November 22nd other accounts receivable, which totaled, together with the Safeway account, a stipulated $40,192.50.

On November 24, 1979, an occasional customer of the Debtor, Mr. Gonzales, picked up a shipment of "nest run eggs" for resale in Mexico and paid the sum of $11,205.00 cash for such eggs. Mr. Gonzales, through his agent and interpreter, had spoken to the production foreman of the Debtor prior to November 16th to determine whether eggs might be available for his needs around the 16th of November. He was instructed that it was possible such delivery could be made. Due to travel difficulties and a storm, Mr. Gonzales did not arrive until the 24th of November. The arrangement with Mr. Gonzales had always been that he could purchase such "nest run eggs" as were available when he arrived to pick up delivery, and while he liked to obtain a full truckload, on a number of occasions, he had not been able to purchase a full truckload and had filled his truck with other merchandise, such as television sets or onions provided by other suppliers in the area.

After the filing of the petition herein, the Debtor delivered several shipments of eggs to Safeway, the last of which occurred on December 1, 1979. In December, as well, three flocks of chickens, totaling some 120,000 birds, were sold to the Campbell Soup Company. These hens had passed the age of prime laying capacity and no longer had utility in the production of eggs.

The Bank contends that the eggs are inventory within the meaning of its security instruments and that the chickens may be inventory or may in fact be equipment. It asserts that it, therefore, had a valid security interest in chickens and eggs. Notwithstanding the status of the chickens and eggs, it asserts a security interest in all of the sales to Safeway, which it claims to have been pursuant to contract; the sale to Mr. Gonzales, likewise asserted to have been pursuant to contract; and the sale of the chickens to Campbell Soup Company, which the Bank suggests may have been pursuant to contract as well. The Bank further claims a security interest in the accounts receivable as of the date of the filing of the petition, thus concluding that all of the cash in the Debtor's possession is

"cash collateral," to which the Bank's security interest extends. The Debtor asserts that the chickens and eggs are "farm products" as that term is used in the Colorado version of the Uniform Commercial Code. 1973 C.R.S. § 4–9–109. That Section describes farm products as:

> . . . crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states (such as ginned cotton, wool-clip, maple syrup, milk, and eggs), and if they are in the possession of a debtor engaged in raising, fattening, grazing, or other farming operations. If goods are farm products they are neither equipment nor inventory.

It would thus seem that if eggs are products of "livestock," the hens themselves must be "livestock" within the meaning of that Section. There does at least seem to be a biological connection. Official Comment to U.C.C. § 9–109; *United States v. Pete Brown Enterprises, Inc.*, 328 F.2d 600 (N.D.Miss.1971). The Bank has not disavowed the biological connection but asserts that in an operation such as this, where the sole business is the production of eggs, the eggs lose their characteristic as farm products and instead become inventory in the operation of a business. Great emphasis is placed by the Bank on the fact that there are no residents on the property of the Debtor and that while certain wheat was grown on adjacent land owned by the Debtor, it was not harvested. The Official Comment to U.C.C. § 9–109 states:

> Products of crops or livestock, even though they remain in the possession of a person engaged in farming operations, lose their status as farm products if they are subjected to a manufacturing process. What is and what is not a manufacturing operation is not determined by this Article. At one end of the scale some processes are so closely connected with farming—such as pasteurizing milk or boiling sap to produce maple syrup or maple sugar—that they would not rank as manufacturing. On the other hand an extensive canning operation would be manufacturing. The line is one for the courts to draw. After farm products have been subjected to a manufacturing operation, they become inventory if held for sale.

The pasteurization of milk or the boiling of sap seem to the Court to be even more significant treatment of raw product than does the washing, candling, and spraying with oil of eggs. At the very least, they are in the same category, and the internal structure of the egg is not changed. The packaging of eggs in cartons does not seem to this Court to be analogous to the "extensive canning operations" characterized by the Official Comment. Nearly all farm products must be packaged in some way for delivery to the farmer's customer. The facts that the packaging is done in the customer's package to eliminate a step in handling or that the operation is highly mechanized, do not seem to this Court to disqualify the operation from the normal farm category. The language of the Code seems reasonably specific in its determination of what are farm products and does not appear to distinguish between the methods of producing the same product. The Bank's refreshing view that only conventional farming techniques which are unmechanized, unsophisticated, and labor intensive can produce farm products is unpersuasive. It is somewhat interesting to note that the loan at the Bank was made through its agricultural loan department.

■ The cases have uniformly found cattle feeding operations to be "farms" for the purposes of U.C.C. § 9–109, although they are not farms in the traditional sense. See, for example, *In re Charolais Breeding Ranches, Inc.*, 20 U.C.C.Rep. 193 (E.D.Wis. 1976), where the court held that a tax shelter cattle feeding operation produced farm products, saying: "Although the bankrupt was not a farmer in the conventional sense, its business consisted of raising, breeding, and maintaining cattle." See also, *Swift & Co. v. Jamestown National Bank*, 426 F.2d 1099 (8th Cir. 1970). There are, of course, cases in which the courts should exercise judgment as to what constitutes a farm for purposes of a statutory construction. See,

for example, *Weed v. Monfort Feed Lots, Inc.*, 156 Colo. 577, 402 P.2d 177 (1965), where it was determined that a feed lot was not a farming operation under the state highway tax statute, which exempted farmers and ranchers from certain taxes. Similarly, in *Mountain Credit v. Michiana Lumber & Supply*, 31 Colo.App. 112, 498 P.2d 967 (1972), the court determined that a logging operation was not a "farming operation" within the meaning of 1973 C.R.S. § 4–9–401(1)(a). It was noted that trees could be farmed in a nursery setting, however. The construction of this statute, however, compels the conclusion that chickens are livestock and eggs are products of livestock. The statutory language is simply too clear. More importantly, the purposes of the Code could be badly abused. The Code was designed to provide a simple public explanation of claimed security interests so that the public might know under what conditions they were dealing with a debtor. To strain the statutory construction as sought by the Bank would seriously impair the public notice features which are the hallmark of the Uniform Commercial Code.

■ The Court must conclude that the Bank has no security interest in the proceeds of either chickens or eggs, except to the extent such proceeds generated a prepetition "account" as defined in 1973 C.R.S. § 4–9–106 (1978 Supp.). The amount of prepetition accounts in which the Bank has a valid security interest is $40,192.50. The Court finds that with the exception of the November 19 shipment of eggs to Safeway, no existing contracts for the sale of eggs existed on the date of the petition which would give rise to a prepetition contract and thus an "account" within the statutory meaning. At the trial herein, the parties were limited in their ability to present evidence with respect to the Campbell Soup chicken purchase, and evidence relating to that matter has been reserved for second trial. Such trial will be conducted consistent with the findings and conclusions herein expressed.

■ The Court concludes that the total sum herein found to be security for the

Bank's debt is now cash in the hands of the Debtor and thus is "cash collateral" within the statutory meaning. The statute prohibits the use of cash collateral without authority of the Court. 11 U.S.C. § 363(c)(2). It does not appear to this Court that it is appropriate in the context of a litigated matter without general notice pursuant to the Rules to accord such use, even if good cause therefor is shown. The statutory provisions permit that the Court do so only after notice and a hearing. There may well be other parties in interest which should have notice, and the responsibility for determining that fact must rest with the judge presiding in the bankruptcy case. This Court, therefore, declines to consider the propriety of such use. The parties are at liberty to proceed as required by statute to present these matters within the context of the Chapter 11 case.