Alan N. CHARNES, as Executive Director of the Department of Revenue of the State of Colorado, Petitioner,

v.

The CENTRAL CITY OPERA HOUSE ASSOCIATION, a Colorado nonprofit corporation; and the Brown Palace Hotel Associates Limited Partnership, d/b/a The Brown Palace Hotel, Respondents.

No. 87SC241.

Supreme Court of Colorado,
En Banc.

May 15, 1989.

Duane Woodard, Atty. Gen., Charles B.
Howe, Chief Deputy Atty. Gen., Richard H.
Forman, Sol. Gen., Steven M. Bush, Asst.
Atty. Gen., Denver, for petitioner.

Halaby & McCrea, Theodore S. Halaby,
Thomas L. Kanan, Denver, for respondents.

QUINN, Chief Justice.

The question in this case is whether a
fundraising event conducted by a nonprofit
organization constitutes legally permissible
or legally impermissible "gambling" as defined in section 18–10–102(2)(d), 8B C.R.S.
(1986), when the participants in the event
use "scrip money" in card and other wagering games with the objective of winning
additional "scrip money" to be used ultimately for bidding on various items auctioned off during the fundraising event. In
*Central City Opera House Association v.
Charnes,* 743 P.2d 58 (Colo.App.1987), the
court of appeals held that the activities
conducted during the fundraising event

constituted legally permissible gambling. We reach a contrary result and reverse the judgment of the court of appeals.

## I.

Under Colorado law "gambling" is a class 1 petty offense, and "professional gambling" is a class 1 misdemeanor. § 18–10–103(1) & (2), 8B C.R.S. (1986). "Gambling" is defined in section 18–10–102(2), 8B C.R.S. (1986), as the risking of money or other thing of value for gain contingent in whole or in part upon lot, chance, or the happening of an event over which the person taking the risk has no control. After so defining "gambling," section 18–10–102(2) goes on to list four separate activities which are not intended to be included within this statutory definition. One of the four exemptions is a mode of social gambling defined in subparagraph (d) of section 18–10–102(2) as follows: any game or wager which is incidental to a bona fide social relationship, which is participated in by natural persons only, and in which no person participates directly or indirectly in "professional gambling."[1] "Professional gambling" consists of aiding or inducing another to gamble and doing so with the intent to derive a profit therefrom. § 18–10–102(8)(a), 8B C.R.S. (1986).[2] In addition, the Colorado Liquor Code prohibits any person licensed to sell malt, vinous, or spirituous liquors at retail to authorize or permit any gambling, or the use of any gambling device or machine, except as provided by the Bingo and Raffles Law.[3] § 12–47–128(5)(n)(I), 5 C.R.S. (1985).

It was against this statutory backdrop that the Central City Opera House Association (Opera House Association), a nonprofit corporation organized under the laws of the State of Colorado and holding tax-exempt status under section 501(c)(3) of the federal Internal Revenue Code, planned to hold a fundraising event known as the Central City Gala (Gala) on April 19, 1986, at the Brown Palace Hotel in Denver, Colorado. Because the plans for the Gala contemplated that the invited guests would use "scrip money" in playing poker, blackjack, craps, and roulette, and in bidding at an auction, and because the Brown Palace Hotel held a Colorado hotel and restaurant liquor license, *see* § 12–47–119, 5 C.R.S. (1985 & 1988 Supp.), the association and the hotel filed a complaint in the Denver District Court seeking a declaration of their legal rights and responsibilities with respect to the Gala. The association and the hotel also requested an order enjoining several law enforcement agencies and officials, including the Denver District Attorney, the Executive Director of the Colorado Department of Revenue, the Director of the Department of Excise and Licenses for the City and County of Denver, and the Denver Chief of Police, from interfering with the Gala. In answering

---

**1.** The full text of section 18–10–102(2), 8B C.R.S. (1986), is as follows:

"Gambling" means risking any money, credit, deposit, or other thing of value for gain contingent in whole or in part upon lot, chance, the operation of a gambling device, or the happening or outcome of an event, including a sporting event, over which the person taking the risk has no control, but does not include:
(a) Bona fide contests of skill, speed, strength, or endurance in which awards are made only to entrants or the owners of entries; or
(b) Bona fide business transactions which are valid under the law of contracts; or
(c) Other acts or transactions now or hereafter expressly authorized by law; or
(d) Any game, wager, or transaction which is incidental to a bona fide social relationship, is participated in by natural persons only, and in which no person is participating, directly or indirectly, in professional gambling.

**2.** The full text of the definition of "professional gambling" in section 18–10–102(8), 8B C.R.S. (1986), is as follows:

(a) Aiding or inducing another to engage in gambling with the intent to derive a profit therefrom; or
(b) Participating in gambling and having, other than by virtue of skill or luck, a lesser chance of losing or a greater chance of winning than one or more of the other participants.

**3.** The Bingo and Raffles Law, §§ 12–9–101 to –113, 5 C.R.S. (1985 & 1988 Supp.), authorizes the Secretary of State to issue a license for games of chance commonly known as bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random. *See* §§ 12–9–102(7) and 12–9–103, 5 C.R.S. (1985 & 1988 Supp.).

the complaint, the governmental agencies and officials took the position that the card and other wagering games at the Gala would constitute illegal gambling in violation of Colorado law.

The case was tried to the court on January 13, 1986. Testimony during the trial centered on the nature of the Opera House Association and the specific plans for the fundraising event. The association's president testified that the association is a non-profit corporation exempt from taxation pursuant to section 501(c)(3) of the federal Internal Revenue Code and that its purposes are the preservation of the Central City Opera House and other historic buildings in Central City and the offering of quality opera and theater programs for people living in Denver and other cities in Colorado. The association consists of approximately 200 members who pay a minimum of $100 annually to maintain their membership. All proceeds from the association's activities are used for charitable purposes and are not distributed to its officers, directors, or members.

The volunteer co-chairperson of the fundraising event also testified and described the plans for the Gala. Attendance would be by invitation only, extended to approximately 2,500 people who were association members, members of an affiliated women's guild, or had shown interest in the association in the past. The Gala was to be held at the Brown Palace Hotel, which holds a Colorado liquor license. The hotel would not charge the association for the hotel space, but would charge for any food and drink served to the Gala invitees. The price for tickets for the Gala would be $375 per couple, with corporate tables available for $3,000 or $5,000. The $375 price for tickets would include a buffet dinner, cocktails, music, and dancing in a "Gay 90s" setting. Although the hotel space provided for the event could accommodate approximately 600 guests, it was anticipated that about 300 people would attend.

The Gala invitees attending the event could make an additional contribution for "scrip money," which could be used to play such games as poker, blackjack, craps, and roulette. These games would be conducted by association volunteers. The "scrip money" could be used to bid on donated items auctioned off during the event. These items would include such goods and services as a fur coat, jewelry, dinners at local restaurants, and vacations at various hotels. The highest bidder with sufficient "scrip money" to cover the bid would be considered the successful bidder for the item in question. The "scrip money" could not be converted back to cash, and any "scrip money" not used to purchase items at the auction would become worthless.

At the conclusion of the evidence the trial court determined that neither the Opera House Association nor the Brown Palace Hotel would be in violation of Colorado law in staging the Gala. The court reasoned that the association was a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code, that the proceeds from the Gala would be applied to the charitable activities of the association and no one would derive a "profit" therefrom, and that any gambling at the event would be incidental to a bona fide social relationship. The court accordingly concluded that the card and wagering games at the Gala would constitute permissible social gambling. After the entry of the trial court judgment, the Gala was held as scheduled on April 19, 1986.

The Executive Director of the Colorado Department of Revenue appealed the ruling of the district court to the court of appeals, which affirmed the judgment. We thereafter granted the Director of Revenue's petition for certiorari to consider whether the card and other wagering games at the Gala constituted legally permissible or legally impermissible "gambling" under Colorado law.

II.

The facts in this case are undisputed, and the issue before us involves a question of law, namely, the proper construction and application of a statute to the undisputed facts. *See, e.g., People v. Colorado Springs Board of Realtors, Inc.,* 692 P.2d 1055, 1068 (Colo.1984); *Weed v. Monfort*

*Feed Lots, Inc.*, 156 Colo. 577, 580, 402 P.2d 177, 179 (1965). The focal point in resolving this issue is the statutory definition of "gambling" in section 18–10–102(2). This definition finds its source in the Colorado Criminal Code, which was enacted in 1971. Ch. 121, sec. 1, § 40–10–102, 1971 Colo.Sess.Laws 388, 477–78. The statutory definition of "gambling" is contained in section 18–10–102(2), 8B C.R.S. (1986), and consists of the following three elements: (1) risking any money or thing of value; (2) for gain—that is, "the direct realization of winnings," § 18–10–102(1), 8B C.R.S. (1986); and (3) contingent in whole or in part upon lot, chance, or the happening of an event over which the person taking a risk has no control. The definition of "gambling," however, does not stop there, but rather goes on to exempt certain conduct which otherwise might reasonably have been considered as satisfying the general definition of "gambling." The statutory exemption pertinent to this case consists of a permissible form of social gambling which, as outlined in subsection 18–10–102(2)(d), 8B C.R.S. (1986), requires the following components: (1) any game, wager, or transaction incidental to a bona fide social relationship; (2) participated in by natural persons only; and (3) in which no person directly or indirectly participates in "professional gambling"—that is, aiding or inducing another to engage in gambling, with the intent to derive a "profit" therefrom, § 18–10–102(8)(a), 8B C.R.S. (1986). For purposes of "professional gambling," the term "profit" means realized or unrealized benefit, direct or indirect, including without limitation benefits from proprietorship, management, or unequal advantage in a series of transactions. § 18–10–102(1), 8B C.R.S. (1986).

In enacting the statutory definition of "gambling" and in proscribing various forms of that activity, the General Assembly set forth the following declaration of purpose in section 18–10–101, 8B C.R.S. (1986):

(1) It is declared to be the policy of the general assembly, recognizing the close relationship between professional gambling and other organized crime, to restrain all persons from seeking profit from gambling activities in this state; to restrain all persons from patronizing such activities when conducted for the profit of any person; to safeguard the public against the evils induced by common gamblers and common gambling houses; and at the same time to preserve the freedom of the press and to avoid restricting participation by individuals in sport and social pastimes which are not for profit, do not affect the public, and do not breach the peace.

(2) All the provisions of this article shall be liberally construed to achieve these ends and administered and enforced with a view to carrying out the declaration of policy stated in subsection (1) of this section.

Since a court's primary task in construing a statute is to give effect to legislative intent, *Colorado Common Cause v. Meyer*, 758 P.2d 153, 160 (Colo.1988); *People v. Guenther*, 740 P.2d 971, 975 (Colo.1987); *People v. District Court*, 713 P.2d 918, 921 (Colo.1986); *Engelbrecht v. Hartford Accident and Indemnity Co.*, 680 P.2d 231, 233 (Colo.1984), we must be cognizant of this legislative declaration of policy. We also must be mindful of the long-standing rule of statutory construction that words and phrases which have acquired a technical or particular meaning by legislative definition should be construed accordingly. § 2–4–101, 1B C.R.S. (1980).

The determination of whether the card and other wagering games at the Gala constituted legally permissible or legally impermissible "gambling" involves two separate inquiries: whether the card and other wagering games at the Gala satisfied the statutory elements of "gambling" in section 18–10–102(2); and, if so, whether this form of "gambling" qualified as socially permissible gambling pursuant to subparagraph (d) of section 18–10–102(2).

### III.

■ We turn first to whether the card and other wagering games at the Gala satisfied that part of section 18–10–102(2) which defines "gambling" as risking a

thing of value for gain contingent in whole or in part upon lot, chance, or the happening of an event over which the person taking the risk has no control.

### A.

Since "gambling" requires the risking of a "thing of value," the initial question is whether the use of the so-called "scrip money" was a "thing of value." As used in the Colorado Criminal Code, a "thing of value" has been broadly defined to include tangible and intangible property, choses in action, and any rights of use or enjoyment connected therewith. § 18–1–901(3)(r), 8B C.R.S. (1986); *see People v. Becker*, 759 P.2d 26, 31–32 (Colo.1988) ("thing of value," in context of statute prohibiting employee of liquor licensee from soliciting bar patron to purchase alcoholic beverage or "any other thing of value," includes anything with economic, monetary, or exchange value). Although the participants in the games used "scrip money" rather than real money, the amount of "scrip money" distributed was in direct proportion to the participant's donation to the Opera House Association, and, to that extent, provided the contributing participants with increased bidding power at the Gala auction. What was being risked by the use of the "scrip money" in the games, therefore, was bidding power at the auction. Even though the "scrip money" not spent at the auction would be worthless after the Gala, the fact remains that the "scrip money" did have value to those participating in the card and other wagering games.

### B.

The next question is whether the participants were risking the "scrip money" for "gain." "Gain" is defined in section 18–10–102(1), 8B C.R.S. (1986), as the "direct realization of winnings." In the statutory definition of "gambling," the term "for gain" is used to describe the purpose or object for which a person risks a thing of value. Considered in that context, it is clear that the "for gain" element of "gambling" is satisfied whenever one risks a thing of value for the purpose of directly realizing winnings as a result of the risk taken. The "for gain" element of "gambling," in other words, includes risks that not only result in success, but also those which result in failure or loss.

Although the Opera House Association argues that the "scrip money" had no inherent value other than at the auction, the argument contains its own refutation, in that the scrip money did have value at the auction. Those participating in the card and other wagering games risked their "scrip money" for more "scrip money" for use at the auction and in doing so were risking a thing of value in order to "gain" more bidding power at the auction.

### C.

The last element of the statutory definition of "gambling" is that the risking of a thing of value for gain be contingent in whole or in part upon lot, chance, or the happening of an event over which the person taking the risk has no control. There is no dispute here over the fact that the card games and other games of chance at the Gala were contingent in whole or in part upon lot or chance or the happening or outcome of an event over which the person taking the risk had no control. While poker and perhaps some of the wagering games might involve some skill, these games certainly are contingent "in part" upon chance, and when, as here, the games involve risking a thing of value for gain, they constitute a form of "gambling" in its commonly understood sense. See *Ginsberg v. Centennial Turf Club*, 126 Colo. 471, 477, 251 P.2d 926, 929 (1952) (the game of poker is not a lottery but is most certainly a form of gambling).

We thus conclude that the card and other wagering games at the Gala satisfied the basic elements of "gambling" set forth in section 18–10–102(2)—namely, risking a thing of value for gain contingent in whole or in part upon lot, chance, or the happening of an event over which the person taking the risk had no control. We must therefore consider whether this form of "gambling" qualified for the permissible

social gambling exemption described in subparagraph (d) of section 18–10–102(2).

## IV.

■ To qualify for the permissible social gambling exemption of subsection 18–10–102(2)(d) the "gambling" must be: (1) incidental to a bona fide social relationship; (2) participated in by natural persons only; and (3) so conducted that no person is participating, directly or indirectly, in "professional gambling."[4] We examine each of these three elements separately.

### A.

This is not the first time we have considered whether a poker game for money was incidental to a bona fide social relationship. In *People v. Wheatridge Poker Club*, 194 Colo. 15, 569 P.2d 324 (1977), we held that poker playing for money was not incidental to a bona fide social relationship where the games were conducted at the facilities of a social club which derived its profits solely from yearly membership dues and a flat "per chair" fee, and where the members of the club were basically strangers brought together through newspaper advertisements and promotions for the sole purpose of gambling. In contrast, we held in *Houston v. Younghans*, 196 Colo. 53, 580 P.2d 801 (1978), that poker playing for money among friends at the home of one of the players was "social gambling" because it was "a game incidental to a bona fide social relationship, participated in by natural persons in no way connected to professional gambling." 196 Colo. at 55, 580 P.2d at 802–03.

The circumstances underlying the fundraising Gala in the instant case are quite different from the poker-playing involved in *Wheatridge Poker Club* and *Houston*. The Gala was staged as a dinner-dance, with the gambling activities serving as part of the entertainment package but not the only feature of the event. Although the Gala invitees attending the event were not necessarily social friends as in *Houston*, they nonetheless were brought together for the common purpose of raising money for the Opera House Association, and not solely for the purpose of gambling as in *Wheatridge Poker Club*. While the issue is certainly not free from all doubt, we are of the view that the dinner-dance format of the Gala, organized to raise funds for the charitable purposes of the Opera House Association and limited to persons who had a common interest in the work of the association, was such as to render the gambling activities incidental to a bona fide social relationship engendered by the event itself.

### B.

We turn next to whether any person other than a "natural person" participated in the card and wagering games at the Gala—an issue not addressed by the trial court or the court of appeals. When used in a statute, the term "person" includes not only natural persons but also artificial "persons" created by law and operating as separate entities, such as corporations, partnerships, and associations organized for a particular purpose. § 2–4–401(8), 1B C.R.S. (1980) (unless statutory context otherwise requires, the term "person" includes individual, corporation, partnership, association, or any other legal entity). The term "natural person," in contrast, refers exclusively to "human beings." *Black's Law Dictionary* 1028 (5th ed.1979); *Webster's Third New International Dictionary* 1507 (1986).

The Opera House Association and the Brown Palace Hotel obviously are "persons" for purposes of the statutory proscription in section 18–10–103, which forbids a "person" from engaging in gambling or professional gambling, but clearly are not "natural persons" for purposes of the permissible social gambling exemption of subsection 18–10–102(2)(d). Since this ex-

---

**4.** Section 18–10–102(2)(c), 8B C.R.S. (1986), excludes from the definition of gambling "[o]ther acts or transactions now or hereafter expressly authorized by law." *See supra* note 1. Neither the Opera House Association nor the Brown Palace Hotel, however, contend that the card and wagering games were expressly authorized by any law separate and apart from the permissible social gambling exemption of section 18–10–102(2)(d).

emption applies when "natural persons only" participate in the "game, wager, or transaction," the question becomes whether the Opera House Association and the Brown Palace Hotel, neither of which is a natural person, "participated" in the gambling at the Gala and thus failed to satisfy the permissible social gambling exemption of subsection 18–10–102(2)(d).

■ In this case, the Opera House Association made the games and "scrip money" available to persons attending the Gala and, through its volunteer members,[5] conducted the card and wagering games on behalf of the association. The association's conduct in running the games constituted a significant level of "participation," and since the association is not a natural person, it follows that the card and other wagering games at the Gala were not "participated in by natural persons only" for purposes of the permissible social gambling exemption created by subparagraph (d) of section 18–10–102(2).

■ In contrast to the activities of the Opera House Association, the role of the Brown Palace Hotel was much more attenuated with respect to the gambling activities. The hotel, through its agents and employees, provided space for the Gala and provided food and drink to the invitees at a price, but played no part in risking "scrip money" in the gambling activities. The hotel, therefore, did not actually "participate" in the card and wagering games for purposes of the permissible social gambling exemption of subsection 18–10–102(2)(d). The hotel, however, held a Colorado liquor license, and section 12–47–128(5)(n)(I), 5 C.R.S. (1985), prohibits a liquor licensee from authorizing or permitting any gambling on the licensed premises. Because the Opera House Association was "participating" in gambling in the hotel, and because the gambling was not sanctioned by the permissible social gambling exemption of subsection 18–10–102(2)(d), the Brown Palace Hotel was acting contrary to the Colorado Liquor Code by authorizing or permitting gambling on its licensed premises.

## C.

The final question to resolve is whether, for purposes of the permissible social gambling exemption, the games and wagering activities were conducted under circumstances "in which no person [was] participating, directly or indirectly, in professional gambling." § 18–10–102(2)(d), 8B C.R.S. (1986). Here again, neither the trial court nor the court of appeals specifically addressed this aspect of the permissible social gambling exemption.

The term "person" in the statutory context of section 18–10–102(2)(d) is not used in its limited meaning of "a human being," but rather in the broader sense of both natural and artificial persons such as corporations, partnerships, and other associations. Professional gambling, as pertinent here, consists of aiding or inducing another to engage in gambling, with the intent to derive a profit therefrom. § 18–10–102(8)(a), 8B C.R.S. (1986). The term "profit" is defined in section 18–10–102(1), 8B C.R.S. (1986), to include any realized or unrealized benefit, direct or indirect, including without limitation benefits from proprietorship or management.

The Opera House Association obviously aided the Gala invitees in gambling and induced them to gamble. The association planned and sponsored the event, made the "scrip money" and games available to the invitees, and, through association volunteers, conducted the games at which the "scrip money" was wagered. Since the purpose of the gambling was to raise money, the association clearly intended to derive a "profit" from the gambling activities.

■ The Opera House Association, however, argues that because it is a nonprofit corporation exempt from federal income taxes under section 501(c)(3) of the Internal

---

5. Nonprofit corporations such as the Opera House Association act only through human beings, whether they be officers, employees, or voluntary agents. *See, e.g., Aimonetto v. Rapid Gas, Inc.,* 80 S.D. 453, 457–58, 126 N.W.2d 116, 119 (1964); 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7, 239–40 (1983). The same holds true for partnerships.

Revenue Code, it could not, as a matter of law, derive a "profit" from the Gala and accordingly had no intent to do so. We find this argument unavailing. The legislative history of gambling legislation in this state belies the notion that the General Assembly intended to exempt nonprofit organizations from the statutory proscription against gambling solely by reason of their nonprofit and tax exempt status. In 1979 the General Assembly expanded the gambling exemptions in subsection 18–10–102(2) in a manner that permitted § 501(c)(3) nonprofit organizations to qualify for a license for gambling and games of chance, Ch. 115, sec. 1, § 18–10–102(2)(e), 1979 Colo.Sess.Laws 556, 557, and in 1981 extended the gambling exemptions to other nonprofit organizations with tax exempt status, Ch. 151, sec. 1, § 12–47–128(5)(n), 1981 Colo.Sess.Laws 812. Both of these amendments, however, were repealed in 1984. Ch. 95, secs. 1 & 2, 1984 Colo.Sess. Laws 436, 436–37. The repeal of the 1979 and 1981 amendments is compelling evidence that the General Assembly intended nonprofit organizations to satisfy the specific terms of subsection 18–10–102(2)(d) in order to qualify for the permissible social gambling exemption therein authorized.[6]

■ Moreover, Colorado law, which defines a nonprofit corporation as "a corporation no part of the *income* or *profit* of which is distributable to its members, directors, or officers," § 7–20–102(10), 3A C.R.S. (1986) (emphasis added), is an implicit acknowledgment that a nonprofit corporation may derive income or profit from its activities and may use that income or profit for purposes consistent with its organizational charter. *See generally* H. Oleck, *Nonprofit Corporations, Organizations, and Associations* 17–25 (4th ed. 1980); 1A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 112, 150–51 (1983). The fact that the revenues generated by the Gala were not distributed to members, directors, or officers of the association did not preclude the association from realizing or from intending to realize a "benefit," and thus a profit, from the Gala. We thus conclude that the Opera House Association aided the Gala invitees in gambling, that it did so with the intent to realize a direct profit therefrom, and that it thereby participated in "professional gambling."

Although the role of the Brown Palace Hotel in the fundraising event was not as directly related to the gambling activities as that of the Opera House Association, we nonetheless are satisfied that the hotel's role also was sufficient to constitute direct or indirect participation in professional gambling. The hotel knowingly furnished the space in which the gambling activities took place and, to that extent, aided those invitees attending the Gala in gambling. Furthermore, since the opportunity to gamble during the Gala was intended to increase the number of persons attending the event, and since the hotel intended to charge for any food and drink served to those in attendance, the hotel stood to realize some "profit", and intended to do so, from any increased attendance due to gambling. In light of the broad definition of "profit" in section 18–10–102(1)—that is, any realized or unrealized benefit, direct or indirect, including benefits from proprietorship or management—we are satisfied that the Brown Palace Hotel not only aided the Gala invitees in gambling but also did so

---

6. Comments made by legislators during committee hearings concerning the proposed repeal of the exemption for nonprofit organizations indicate that the 1979 and 1981 exemptions led to situations which had the potential for abuse. By allowing nonprofit organizations to raise funds through "gambling nights," a number of "poker palaces" had come into being. These so-called "poker palaces" were primarily bars and restaurants which had obtained licenses to conduct poker nights to benefit § 501(c) organizations. While nonprofit organizations were able to raise a considerable amount of money in this fashion—on the order of $20,000 to $30,000 for a week-long fundraising event—the organizers, which were for-profit organizations, were able to reap lucrative benefits. Testimony at the legislative hearings and comments from legislators indicate concern that such profits provided opportunities for cheating or participation by organized crime. The legislature, while sympathetic to the purposes of nonprofit organizations, nonetheless repealed the exemptions created for nonprofit organizations. *See* Tape Recordings of Senate Judiciary Committee Hearing, April 5, 1984, and House Judiciary Committee Hearing, April 11, 1984.

with the intent to realize a profit therefrom and thus was "participating, directly or indirectly, in professional gambling."

## V.

While we are not unsympathetic to the laudable goals of nonprofit organizations, we cannot ignore the explicit policy declaration of the General Assembly that the provisions of the statutory prohibitions against gambling shall be construed in a manner calculated to restrain all persons from seeking profit from gambling activities and to restrain all persons from patronizing such activities when conducted for profit. § 18–10–101, 8B C.R.S. (1986). If nonprofit organizations, such as the Opera House Association, are to be accorded a per se exemption from the statutory proscriptions against gambling and professional gambling, such exemption must come from the General Assembly. Our task is to construe section 18–10–102(2) as written and to apply its terms to the uncontroverted facts before us so as to give effect to its expressed purpose.

Since the card and wagering games at the Gala constituted "gambling" as defined in section 18–10–102(2) and did not qualify for the permissible social gambling exemption created by subsection 18–10–102(2)(d), we reverse the judgment of the court of appeals.