Victor **CICCARELLI** and Barbara Ciccarelli, Plaintiffs–Appellees,

v.

**GUARANTY BANK, Defendant–Appellant.**

No. 02CA2335.

Colorado Court of Appeals, Div. V.

March 25, 2004.

Certiorari Denied Oct. 4, 2004.

Kutner Miller Kearns, PC, Lee M. Kutner, David M. Miller, Denver, Colorado, for Plaintiffs–Appellees.

Podoll & Podoll, PC, Robert C. Podoll, Greenwood Village, Colorado, for Defendant–Appellant.

Opinion by Judge RUSSEL.

In this fraudulent transfer and unjust enrichment action, defendant, Guaranty Bank, appeals the judgment in favor of plaintiffs, Victor and Barbara Ciccarelli. We reverse and remand.

In 1996, Chance Northern, LLC owned 99% of both Chance I Bingo, LLC, and Chance II Bingo, LLC. Chance Northern had no other assets and existed solely as a holding company.

In April 1996, Guaranty Bank made a $250,000 loan to Chance Northern. Chance I and Chance II were not borrowers or guarantors on the loan, but they received the benefit of the proceeds: $170,000 funded Chance I's acquisition of a bingo hall from plaintiffs; the remaining $80,000 funded Chance II's acquisition of a different bingo hall.

Because the total purchase price of the two halls was $500,000, plaintiffs personally loaned $170,000 to Chance I and $80,000 to Chance II to complete the transactions. These loans were secured by the assets of Chance I and Chance II respectively. Plaintiffs also entered into a consulting agreement and an employment contract with Chance I and Chance II.

In 1996 and 1997, the Bank also made three loans to Payless Bingo Supply, LLC, a corporation that was related to Chance I and II. The loans to Payless totaled $450,000.

By 1998, Chance I, Chance II, and Payless were all having financial problems. Payless was nearly out of business. Chance II had filed for bankruptcy. And though Chance I was making payments to both the Bank and plaintiffs, those payments were often late,

and the checks were sometimes returned for insufficient funds.

In May 1998, the Bank agreed to consolidate the remaining balances of the $250,000 Chance Northern loan and the $450,000 in Payless loans for a new note in the approximate amount of $564,000. As in 1996, Chance Northern was a borrower; Chance I and Chance II were not. The Bank accepted lower payments, but it took a security interest, junior to plaintiffs', in the assets of Chance I.

Also in 1998, plaintiffs agreed to a similar restructuring of Chance I's debt. They agreed to accept lower payments over a longer period of time and renegotiated the employment agreement.

But financial matters worsened. By October 1998, Chance I was the only entity making payments to the Bank and plaintiffs. Despite another debt restructuring in 1999, Chance I continued to make late payments and bounce checks. It had stopped paying plaintiffs on the employment contract, and it owed approximately $123,000 to the Internal Revenue Service.

In November 2000, Chance I filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. Shortly thereafter, it acknowledged that its reorganization efforts were hopeless and voluntarily dismissed its bankruptcy case. It agreed to return the assets of Chance I to plaintiffs.

In November 2001, plaintiffs brought this action to recover approximately $60,000 in loan payments made by Chance I to the Bank during 1999 and 2000. Plaintiffs asserted that those payments were fraudulent under the Colorado Uniform Fraudulent Transfer Act (CUFTA), §§ 38–8–101 to 38–8–112, C.R.S.2003. Plaintiffs also asserted that the payments had unjustly enriched the Bank.

The trial court agreed. Although it rejected plaintiffs' claim of intentional fraud, the court found that Chance I's payments were fraudulent transfers under CUFTA. The court also held that the Bank had been unjustly enriched.

## I.

The Bank first challenges the trial court's ruling that Chance I's loan payments were fraudulent transfers. We agree with the Bank.

### A. Governing Statutes

The trial court held the Bank liable under two provisions that define fraudulent transfers. As relevant here, the statutes forbid transfers by an insolvent debtor that occur without an exchange for "reasonably equivalent value":

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
. . .

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(I) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(II) Intended to incur, or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Section 38–8–105, C.R.S.2003.

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Section 38–8–106(1), C.R.S.2003.

### B. Issue on Review

It is undisputed that Chance I was insolvent during 1999 and 2000, when it made the now contested loan payments. It is also undisputed that Chance I was not an obligor

on the 1996 loan or the 1998 and 1999 consolidations. Thus, the issue is this: Did the trial court correctly determine that Chance I had not received reasonably equivalent value for the payments that it made on behalf of its corporate parent?

### C. Standard of Review

■ The determination of reasonably equivalent value under CUFTA requires an analysis of all the facts and circumstances surrounding the transaction and applies a rule of reasonableness in light of the particular circumstances. *Schempp v. Lucre Mgmt. Group*, 18 P.3d 762, 765 (Colo.App.2000). Fraudulent transfer claims are equitable in nature. *Morris v. Askeland Enters., Inc.*, 17 P.3d 830, 832–33 (Colo.App.2000). Equity looks to the substance of a transaction rather than its form. *Wilson v. Goldman*, 699 P.2d 420, 426 (Colo.App.1985).

■ Whether a transfer is made for reasonably equivalent value is largely a question of fact as to which considerable latitude must be given to the trier of fact. *Cf. In re Kelsey*, 270 B.R. 776, 779 (B.A.P. 10th Cir.2001)(reasonably equivalent value standard under bankruptcy code). However, we evaluate the legal significance of undisputed facts de novo. *See Weed v. Monfort Feed Lots, Inc.*, 156 Colo. 577, 580, 402 P.2d 177, 179 (1965) (the legal significance of undisputed facts is a question of law); *Omedelena v. Denver Options, Inc.*, 60 P.3d 717, 722 (Colo. App.2002)(when the relevant facts are undisputed, an appellate court may make an independent determination of any legal question).

### D. Discussion

Colorado courts have not yet addressed whether, under CUFTA, a subsidiary corporation receives reasonably equivalent value for loan payments that it makes on behalf of its corporate parent. But the question has been addressed by other courts in the context of bankruptcy proceedings. These courts have held that, when the subsidiary has received the benefit of a loan made to its parent, the subsidiary's payments on the parent's debt are made in exchange for reasonably equivalent value.

For example, in *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d 479 (4th Cir.1992), the Fourth Circuit considered whether loan payments were constructive fraudulent transfers under 11 U.S.C. § 548(a)(2). The issue was whether a subsidiary corporation had received reasonably equivalent value in exchange for payments that it made on a line of credit incurred by its corporate parent. Instead of routing its payments though the corporate parent, the subsidiary paid the bank directly. *See Jeffrey Bigelow, supra*, 956 F.2d at 481 ("The debtor, in making its payments, in effect skips its true creditor and sends the money to [the bank], to whom it has no direct obligation."). The Fourth Circuit held that there was no fraudulent transfer because the subsidiary corporation had received draws on the line of credit equal to the amount that it paid to the bank. *See Jeffrey Bigelow, supra*, 956 F.2d at 485 ("The transfers by the debtor served simply as repayment for money received.").

Similarly, in *In re Holly Hill Medical Center, Inc.*, 44 B.R. 253, 255 (Bankr.M.D.Fla. 1984), the court determined that the debtor corporation received reasonably equivalent value for interest payments that it made on a loan obtained by another corporation. There was no fraudulent transfer under § 548(a)(2), ruled the court, because the loan was taken strictly to fund the operation of the debtor. *See also In re Evans Potato Co.*, 44 B.R. 191 (Bankr.S.D.Ohio 1984)(under § 548(a)(2), debtor corporation received reasonably equivalent value for payments made on a line of credit obtained by a third party, where the corporation had received the exclusive use of the goods sold on credit).

We find these cases instructive. *See Schempp v. Lucre Mgmt. Group, supra*, 18 P.3d at 764 (in deciding claims of fraudulent transfer under CUFTA, § 548 of the Bankruptcy Code is instructive because the statutes have the same underlying purpose). And in applying the reasoning of these cases, we conclude that the trial court erred in finding a fraudulent transfer.

■ Although Chance I was not a party to the 1996 loan, it clearly received a benefit from that loan. The trial court found that $170,000 of the proceeds was used to fund

Chance I's acquisition of plaintiffs' bingo hall. Because Chance I benefited in the amount of $170,000, its payments up to that amount (plus interest) were made for reasonably equivalent value.

Plaintiffs contend that Chance I received nothing from the Bank. Because Chance I acquired the bingo hall solely though its corporate parent, plaintiffs argue, it could make payments for reasonably equivalent value only if it paid the corporate parent.

We reject this formalistic view. While it would have been possible for Chance I to pay Chance Northern, which in turn could have paid the Bank, we see no reason to invalidate, as "fraudulent," any payment not traveling this route. This is particularly true when, as here, there is no evidence of intent to defraud other creditors.

Nevertheless, plaintiffs argue, Chance I could not make payments after 1998 because the 1998 and 1999 loan consolidations effectively severed any link between Chance I and the 1996 loan. In plaintiffs' view, the 1998 loan was "entirely new" because it retired the 1996 debt and incorporated $350,000 of other debt for which Chance I was not liable and from which it received no benefit.

We disagree. Because the unpaid portion of the 1996 loan was included in the consolidated loans, Chance I could continue to make payments after 1998.

We acknowledge the possibility that Chance I might eventually have paid more on its parent's behalf than the benefit it received. And we agree that, if this had happened, the extra payments might well have been fraudulent transfers. *Cf. In re Wes Dor, Inc.,* 996 F.2d 237, 243 (10th Cir.1993) (bank did not give "value" under 11 U.S.C. § 548(c) for transfers in excess of the amount that subsidiary had received). But this did not happen here: (1) Chance I paid, at most, $66,000 on the 1996 loan; (2) after the 1998 and 1999 consolidations, Chance I paid an additional $60,000; (3) the $126,000 total falls well within the $170,000 benefit that Chance I received from the 1996 loan proceeds.

We consider one last point. The trial court found that when Chance I gave the Bank a security interest on its assets as part of the 1998 consolidation, this was itself a fraudulent transfer. We need not decide whether the trial court erred in making this finding. The trial court's award was based solely on the loan payments, and its finding here—that the security interest was fraudulent—does not affect our determination that the payments were made for reasonably equivalent value.

Even if fraudulent, the security interest does not support an award independently. The record is devoid of any evidence quantifying the value of the security interest itself. And the record is clear that the security interest did not enable the Bank to recover any of Chance I's assets.

We therefore conclude that the trial court erred when it found that Chance I's payments were fraudulent transfers under CUFTA.

## II.

The Bank next argues that the trial court erred in finding liability under a theory of unjust enrichment. We agree.

### A. Standard of Review

Whether a plaintiff can recover under a theory of quantum meruit or unjust enrichment is a mixed question of law and fact. *Scott Co. v. MK–Ferguson Co.,* 832 P.2d 1000, 1003 (Colo.App.1991). As with the CUFTA claim, the Bank does not dispute the trial court's factual findings and instead challenges its legal conclusions. We therefore review de novo. *Omedelena v. Denver Options, Inc., supra,* 60 P.3d at 722.

### B. Unjust Enrichment

To recover under a theory of unjust enrichment, a plaintiff must show that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying. *DCB Constr. Co. v. Central City Dev. Co.,* 965 P.2d 115, 118 (Colo.1998). As with causes of action under CUFTA, unjust enrichment actions are equitable in nature. *Interbank Invs., L.L.C., v. Vail Valley Consol. Water Dist.,* 12 P.3d 1224, 1229–30 (Colo.App.2000).

■ We conclude that the trial court misapplied the third element of the unjust enrichment claim. There is no evidence that the Bank acted in an improper or deceitful manner. *See DCB Constr., supra,* 965 P.2d at 117 (for enrichment to be unjust, there must be a showing of improper, deceitful, or misleading conduct by the person who received the benefit). Nor did plaintiffs show that Chance I made disproportionately high payments to the Bank or otherwise conducted its affairs to disadvantage plaintiffs.

The record shows that Chance I bought a bingo hall with $170,000 of the Bank's money and thereafter made payments on that amount. The circumstances do not support a conclusion that it would be unjust for the Bank to retain the benefit of those loan payments.

The judgment is reversed, and the case is remanded to the trial court with directions to enter judgment in favor of the Bank.

Judge VOGT and Judge DAILEY concur.